**In re Eugene P. HINES, Respondent.**

**No. M–141–82.**

District of Columbia Court of Appeals.

Argued Sept. 15, 1983.

Decided Sept. 26, 1984.

Martha J. Tomich, Asst. Bar Counsel, Washington, D.C., with whom Fred Grabowsky, Bar Counsel, Washington, D.C., at the time the brief was filed, was on the brief, for petitioner.

William F. Hickey, Washington, D.C., for respondent.

Before NEWMAN, Chief Judge, and NEBEKER and TERRY, Associate Judges.

PER CURIAM:

This case comes before the court on the report of the Board on Professional Responsibility (BPR) recommending that respondent, a member of the bar, be suspended from the practice of law. A hearing committee of the BPR found that respondent had violated certain disciplinary rules in two separate cases. In one case, Bar Docket No. 447–79 (the Nusbaum case), the committee found that respondent had violated Disciplinary Rules 9–103(A),[1] 1–102(A)(4),[2] 9–103(B)(4),[3] and 7–101(A)(3).[4] The BPR adopted the committee's findings. In the other case, Bar Docket No. 194–80 (the Shakkour case), the committee found that respondent had violated DR 9–103(A). The BPR again adopted the committee's findings but ruled that respondent had also violated DR 1–102(A)(4). The committee recommended that respondent be publicly censured for his various violations. The BPR, however, urges a two-year suspension.

Respondent contends that the BPR erred in finding a violation of DR 1–102(A)(4) in the Shakkour case, that the hearing committee should have severed the two petitions filed against him, that the BPR should have granted his request for a personal appearance after oral argument, at which he could not be present, and that the sanction recommended by the BPR is too severe. We reject all of these contentions. Having concluded that the BPR acted properly and that the recommended sanction is consistent with prior sanctions for similar conduct, we suspend respondent for two years.

I

In the fall of 1979 respondent was retained by Linda Shakkour and Kathleen Flynn in connection with their plans to open a restaurant. With the financial assistance of Miss Shakkour's father and uncle, Henry and Bahjat Shakkour, a site for

1. DR 9–103(A) states, in pertinent part, that "[a]ll funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts...." The report of the hearing committee, made on March 18, 1982, refers to the failure of respondent to maintain identifiable client bank accounts as a violation of DR 9–102(A). By order of this court on April 30, 1982, however, DR 9–102 was renumbered as DR 9–103. We shall therefore use the new number in citing this rule.

2. DR 1–102(A)(4) prohibits a lawyer from engaging in "conduct involving dishonesty, fraud, deceit, or misrepresentation."

3. DR 9–103(B)(4), formerly DR 9–102(B)(4), provides that a lawyer shall "[p]romptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

4. DR 7–101(A)(3) states that a lawyer must not intentionally "[p]rejudice or damage his client during the course of the professional relationship."

the proposed restaurant was found, and respondent began negotiations for a lease.

In the course of the negotiations, respondent told his clients that an escrow deposit of $2,850 was required to reserve the property. On January 17, 1980, Bahjat Shakkour drew a check for this amount, post-dated to January 21, and noted on the memorandum line that it was an escrow deposit. Respondent deposited the check that same day, January 17, in his professional account at Riggs National Bank,[5] writing "Escrow Shakkour" on the deposit slip. The check was not honored by Mr. Shakkour's bank. When it was returned to respondent, he redeposited it on January 23, but in his personal account rather than his professional account. This time the check cleared. On February 4 respondent drew a check for $2,500 on his personal account and deposited it in his professional account.[6]

In mid-February the Shakkours and Miss Flynn decided to abandon the restaurant venture. Respondent subsequently sent them a bill for services rendered in the amount of $3,584.60. When a dispute arose concerning his fee, respondent informed his clients that he had been advised by Bar Counsel that he could assert a lien on the $2,850, which he referred to as an "escrow deposit." He told them that he would refund this amount as soon as his bill was paid, and set up a retaining lien.[7]

The hearing committee concluded that respondent had violated only DR 9–103(A). This violation occurred when respondent deposited the $2,850 check, which was drawn by Bahjat Shakkour for the purpose of holding the negotiated lease, in his professional account and then in his personal account. The committee found that a concession by respondent, his characterization of the $2,850 as "escrow" money, and the assertion by him of a retaining lien all indicated that he "surely was aware that the funds were the property of the client" which "from the moment of receipt [he] was obligated to deposit ... into a segregated account." The BPR agreed that respondent's conduct violated DR 9–103(A), but also concluded that it contravened DR 1–102(A)(4). It found that his indiscriminate deposit of admitted escrow money in accounts that contained personal funds, combined with his failure to keep running account balances and to examine his monthly banking statements, demonstrated a "reckless disregard" for the status of the accounts in which he deposited his clients' money. This recklessness, the BPR declared, gave rise to "an inference that there was an intent on respondent's part to deal with and use funds escrowed for clients as his own." On the basis of this inference, the BPR concluded that respondent had engaged in conduct involving dishonesty in violation of DR 1–102(A)(4).[8]

5. Respondent maintained three accounts at Riggs Bank. The first, which he called his "professional account," provided funds for his office and other business expenses. Respondent deposited his own funds, as well as the clients' funds involved in both of the cases before us, in this account. In the second account, the "personal account," respondent also deposited both his own funds and the clients' funds at issue here. In addition, he sometimes transferred funds from this personal account into his professional account. The third account at Riggs Bank was a savings account.

6. On this date respondent also deposited $800 in escrow funds involving another client in his professional account. Because this deposit was not the basis for any of the violations found by the hearing committee or the BPR, we do not consider it in reaching our decision.

7. A retaining lien is the "right of an attorney to retain possession of a client's documents, money, or other property which comes into the hands of the lawyer professionally until the general balance due him for legal services is paid." Grabowsky, *Attorney's Liens,* DISTRICT LAWYER, April 1978, at 6.

8. Both the hearing committee and the BPR took pains to point out that, in addition to commingling funds, respondent on many occasions did not have a sufficient total balance in the commingled accounts to cover all the funds he was supposed to be holding for his clients. From this evidence the BPR concluded that respondent actually misappropriated his clients' funds—that is, he used them "as if they were his own." *See In re Harrison,* 461 A.2d 1034 (D.C. 1983). The fact that there was misappropriation as well as commingling has a direct bearing

## II

Early in 1980 respondent undertook to represent Jane Nusbaum, another attorney, with regard to a legal claim she was pursuing against an estate. It was agreed that respondent would receive as his fee half of whatever was recovered. However, when the claim was settled, and respondent received a check for $8,136 payable jointly to him and Nusbaum, they further agreed that $682 of the $4,068 Nusbaum was to receive would be applied to the balance she owed respondent for prior legal services. Of the remainder of Nusbaum's portion of the settlement ($3,386), respondent agreed to send $1,886 [9] directly to Nusbaum and to transfer the balance ($1,500) to Nusbaum's checking account at Riggs National Bank.

Respondent deposited the $8,136 settlement check in his professional account and drew a check on that account for $1,886, payable to Nusbaum. On the memorandum line of the check he wrote "In Partial Payment," followed by an illegible word. However, he failed to transfer the $1,500 from his professional account to Nusbaum's account. On several occasions in early April, Nusbaum asked respondent to do so, and he told her that he would. In at least two instances, respondent said that the delay was due to problems with his account at Riggs.[10]

The hearing committee found, and the BPR agreed, that respondent had intended at least initially to transfer the $1,500. The committee also found, however, that as respondent began to realize that Nusbaum might not have the money to pay the prior legal fees she had incurred,[11] he "reevaluated his decision to remit the $1,500." It acknowledged that the note respondent sent to Nusbaum on April 13 offering excuses for his failure to transfer the money "may have been prompted more by a desire to avoid an unpleasant confrontation than by an intent to deceive." However, it concluded that the promises he made on April 18 and 22 revealed "a conscious deception, for by that time his intention to release the money had changed." The committee found that respondent's April 18 and 22 promises to transfer were "deliberate misrepresentations violative of DR 1–102(A)(4)."

The committee also concluded that respondent's failure to retain the $1,500 in an identifiable bank account was a violation of what is now DR 9–103(A). It rejected respondent's contention that the $1,500 constituted a payment of the additional fees which Nusbaum owed him. In so concluding, the committee pointed to the notation on the $1,886 check, to the April 13 note in which respondent also suggested he might

---

on our choice of a sanction to be imposed. See pages 385–386, *infra.*

9. The hearing committee stated that the parties agreed that Nusbaum would receive a check in the amount of $1,186; this figure, however, is apparently a typographical error. In the next sentence of the committee's finding, the amount of the check is said to have been $1,886, which would be mathematically correct. We deem this error to be immaterial.

10. Bar Counsel contended that this statement was in itself a violation of DR 1–102(A)(4), citing as evidence of respondent's dishonesty his bank statement of March 31, 1980. The statement showed that $8,136 was credited to his professional account on March 28, implying, under Bar Counsel's theory, that in reality there were no problems with the account. The hearing committee rejected this contention, stating that the only thing the bank statement proved was "that on the date the statement was prepar-

ed, the check was recorded as a deposit on March 28." The committee noted that respondent said he had received contrary information over the telephone, and it credited the testimony of a disinterested bank employee, Selena Harris, who confirmed that respondent had made several inquiries about computer errors relating to deposits in his account. The committee also accepted testimony that the Riggs Bank's computer system was occasionally unreliable and that there were various reasons why a deposit might not register in the computer.

These findings of the hearing committee were adopted by the BPR.

11. Respondent was aware that Nusbaum's account at Riggs Bank was substantially overdrawn. In fact, respondent contacted a Riggs official at her request and informed him that the $1,500 deposit was imminent. Nusbaum apparently felt that such a reassurance from respondent might dissuade Riggs from pursuing threatened legal action.

credit Nusbaum's account with him in the amount of $1,500, and to an April 21 letter requesting an opinion from the Legal Ethics Committee as to whether he could impose a lien on the $1,500, as evidence of respondent's awareness that the $1,500 belonged to Nusbaum.[12] The BPR adopted these findings and conclusions.

The BPR also agreed with the committee's determination that respondent had violated two other disciplinary rules. DR 9–103(B)(4) was violated when respondent, before asserting a retaining lien against Nusbaum, failed to comply with her requests to transfer her money either to Riggs or to her. Finally, the committee found that respondent's failure to transfer the $1,500 to Nusbaum's account, as he had said he would, contributed to the financial difficulties she was experiencing at the bank.[13] Even if, as respondent suggested, Nusbaum treated him in an exploitative manner, the committee declared that "he was required to act with an integrity which exceeded that expected of the layman." It concluded that respondent's "willing[ness] to prejudice [his client's] standing with the bank and expose her to legal action [came] within the broad proscription of DR 7–101(A)(3)."

### III

We may quickly dispose of respondent's first contention. He argues that since the hearing committee found no violation of DR 1–102(A)(4) in the Shakkour case, the BPR erred in finding one. There is no legal support for such an argument. Under Rule XI, § 4(3)(g), of our Rules Governing the Bar, the BPR has not only the power but the duty "[t]o review the findings and recommendations of hearing committees with respect to formal charges and to prepare and forward its own findings and recommendations, together with the record of the proceeding before the hearing committee and the Board, to this Court."

 Despite the hearing committee's power to make findings of fact and conclusions of law, its recommendations are by no means binding upon the BPR. *See, e.g., In re Goldstein,* 471 A.2d 267 (D.C.1984); *In re Stanton,* 470 A.2d 281 (D.C.1983); *In re Smith,* 403 A.2d 296 (D.C.1979). In this case the BPR made no findings of fact to augment or contradict those made by the hearing committee. Rather, it accepted the facts as found by the committee, but reached a different conclusion of law on the question of whether those facts established more than one disciplinary rule violation.[14] We agree with the BPR's conclusion that respondent violated DR 1–102(A)(4) in the Shakkour case. *See In re James,* 452 A.2d 163 (D.C.1982), *cert. denied,* 460 U.S. 1038, 103 S.Ct. 1429, 75

---

**12.** The committee construed the "partial payment" notation on the $1,886 check to mean that an additional payment would be made. The April 13 note was in part a request that Nusbaum consent to apply the $1,500 to respondent's legal fees, demonstrating again that respondent did not view the money as his own. Finally, the discussion of a possible lien was also an indication that respondent did not believe the $1,500 was his, because, as the committee observed, "a lien is premised on the notion that an attorney is in possession of a client's property."

**13.** The committee acknowledged that Nusbaum "was primarily at fault for failing to fulfill her obligations to the bank" and that respondent's actions "had only an indirect impact on [her] financial difficulties." Nonetheless, it concluded that respondent's failure to transfer the $1,500, at least prior to April 22, 1980 (when

Nusbaum was informed of the retaining lien), added to her financial woes.

**14.** The instant case, though not inconsistent with *In re Smith, supra,* differs factually from *Smith* in one respect. In *Smith* the BPR, after reinstating charges that had been dropped by a committee, was obliged to engage in factfinding, a task usually undertaken by the hearing committee, before it could determine whether any disciplinary rule had been violated. Performing this function, the BPR was required to weigh the evidence according to the "clear and convincing" standard. In the case at bar, however, the BPR reinstated no charges and did no factfinding. Therefore, our review focuses not on whether the evidence before the BPR was "clear and convincing," but on whether the BPR committed any error of law. We hold that it did not.

L.Ed.2d 789 (1983); *In re O'Bryant,* 425 A.2d 1313 (D.C.1981).[15]

## IV

Respondent also maintains that the hearing committee erred in failing to sever the two cases, arguing that one case (which he does not identify) exerted a "prevailing influence" on the other. This contention is meritless for a number of reasons.

■ First, although the same committee considered the two cases, they were heard on separate dates, more than two months apart. Thus any possible spillover effect, of the sort normally associated with joinder of offenses, was reduced to a minimum. Second, the simultaneous consideration by one hearing committee of all the charges brought against respondent was well within the committee's power. Respondent has failed to show how he was prejudiced by the fact that the two cases were heard by the same committee, nor can we discern any prejudice. It is not unusual for a single committee to weigh at one time charges against an attorney stemming from his dealings with more than one client; indeed, such cases are almost routine. *See, e.g., In re Alexander,* 466 A.2d 447 (D.C.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1680, 80 L.Ed.2d 154 (1984); *In re Thorup,* 461 A.2d 1018 (D.C.1983); *In re James, supra.*

■ Third, the simultaneous consideration of respondent's cases is fully consistent with the main purpose of the disciplinary process. A license to practice law in the District of Columbia is a continuing proclamation by this court of an attorney's fitness to practice. D.C.Rules Governing the Bar, Rule XI, § 2. Such fitness extends to the full range of the attorney's professional and personal conduct. An at-

torney's competence can be evaluated only by a disciplinary process that measures his or her behavior as a whole, not by separate inquiries into isolated instances of alleged misconduct. We agree with the Pennsylvania Supreme Court, which rejected a similar argument by an attorney in a disciplinary proceeding:

> What respondent ignores is that the function of the disciplinary proceeding is to determine the continued fitness of an attorney to practice law.... That determination can only be made by viewing the "total picture" of his professional conduct.... He cannot complain simply because his fitness to practice is to be measured against several charges rather than one.

*Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 484, 345 A.2d 616, 622 (1975) (citations omitted), *cert. denied,* 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976).

■ Finally, although respondent raised this severance issue before the hearing committee, he failed to do so before the BPR. In *In re James, supra,* this court rejected two attempts by the respondent to bring to court issues that had not been raised in earlier proceedings. One of these attempts, very much like the situation at bar, involved an issue that he had presented to a hearing committee, but failed to raise before the BPR. Recognizing the similarity between our review of BPR proceedings and that of administrative agency actions,[16] and following the authority of several state courts in similar cases, we held that the respondent, by failing to bring the issue to the attention of the BPR, had waived his right to have it considered by this court. Therefore, even if respon-

---

**15.** We also reject respondent's argument that without proof of scienter there can be no violation of DR 1–102(A)(4). "The scienter requisite to a disciplinary code violation can be inferred from respondent's conduct." *In re James, supra,* 452 A.2d at 166 (citations omitted).

**16.** "Our consideration of Board findings and recommendations is similar to our review of administrative agency decisions.... In the context of administrative appeals, we do not address objections that could have been, but were not raised prior to judicial review." *In re James, supra,* 452 A.2d at 169 (citations omitted).

dent's severance argument had any merit (which it does not), we would hold that he waived the issue by not raising it before the BPR.

## V

Respondent contends that the BPR erred in refusing to give him an opportunity to appear personally before it after the hearing at which his attorney presented oral argument in his behalf. Respondent requested such an appearance by letter to the BPR on the day after the hearing, which he did not attend, and again by motion a month later, attributing his earlier absence to an appearance he had to make on behalf of a client in a federal court. In the motion respondent also asserted a need to appear before the BPR in order to counter what he contended were prejudicial "demonstrative actions" by one of the complainants, Jane Nusbaum, during the hearing.[17]

■ Respondent cites not a single case, and we know of none, holding that he has a right to a post-argument personal appearance before the BPR. At most, we think that the BPR would have discretion to allow such an appearance.[18] We see no evidence of any abuse of that discretion. The BPR did not consider any new evidence but simply reviewed the evidentiary record provided by the hearing committee. Rule XI, § 7(3) of our Rules Governing the Bar provides only for the submission of briefs and oral argument in proceedings before the BPR, and even briefing and argument may be waived in some cases. Moreover, the rule requires the BPR to render its decision "promptly after the conclusion of oral argument or waiver thereof"; no post-argument proceeding is even contemplated. We cannot find that respondent was in any

way deprived of a material right by the BPR's denial of his request for a personal appearance; accordingly, we hold that there was no error in that denial.

## VI

Finally, respondent challenges the two-year suspension proposed by the Board. He maintains that this sanction is too severe, and urges us instead to impose only the public censure recommended by the hearing committee, if we decide that any sanction is warranted at all.

Our review of BPR recommendations is plainly limited by the following language in Rule XI, § 7(3):

In considering the appropriate order, the Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted.

In this case the findings are fully supported by substantial evidence. Respondent himself admits in his brief that he commingled his clients' funds with his own; and even without such a concession, there is ample evidence of commingling in the record. Our inquiry, then, turns to the disciplinary sanctions that have been meted out in other cases involving conduct similar to that of respondent.

Since our present disciplinary system was set up more than twelve years ago, disbarment has been the usual sanction in commingling cases. Twenty-eight such cases have come before this court, and in twenty of them the attorneys have been disbarred.[19] Only three cases in which an

---

17. In response to the letter, the BPR stated that a personal appearance such as that requested by respondent was not contemplated by its rules. In denying his later motion, the BPR said that Nusbaum's conduct, to the extent that it was even noticed by the members of the BPR, had no effect on its decision.

18. Respondent conceded in his motion that the BPR had "discretionary authority" to grant his request for a personal appearance.

19. In many of these cases there were additional factors contributing to the court's decision to order disbarment, such as a prior disciplinary record, repeated instances of misconduct, or violations of other disciplinary rules. In seven

attorney failed to preserve the identity of a client's funds have resulted in sanctions less severe than suspension;[20] in all three the attorneys were censured by the court. Since none of those cases involved a violation of DR 1–102(A)(4), as does the instant case, we believe that the BPR was correct in rejecting the sanction recommended by the hearing committee.

Suspension has resulted in the other five cases in which there was commingling.[21] Of those five, *In re O'Bryant, supra,* and *In re Harrison, supra* note 8, are closest to this case on their facts. In *O'Bryant* an attorney was appointed to represent· a woman charged with embezzlement. The hearing committee found that O'Bryant, after receiving approximately $5,000 in fees and expense money, asked his client to give him nearly $15,000 more to ensure her release in the event the court set a high bond. O'Bryant deposited the money in his office's client trust fund, then withdrew it and redeposited it in a Florida bank account. The client was later released on her own recognizance and eventually pleaded guilty. Even after she was sentenced, however, O'Bryant refused to return the $15,000, claiming that his client had orally agreed to apply it to the payment of his fee. The hearing committee credited the client's testimony, in which she both denied the alleged agreement and stated that O'Bryant's only estimate of a fee was between $5,000 and $9,000, depending upon whether the case went to trial. The BPR, accepting the committee's findings, concluded that O'Bryant had violated the disciplinary rule against commingling, the rule requiring him to return his client's money upon request, and the rule prohibiting deceitful conduct, the latter violation occurring when he stated that the $15,000 was

part of his agreed legal fee. The BPR rejected a hearing committee suggestion that a one-month suspension be imposed, and recommended instead that O'Bryant be suspended for six months for violating the three rules. We accepted the BPR's recommendation.

In *Harrison* the attorney received in October a check endorsed by his client, Mr. Hart, in settlement of a personal injury claim. He deposited the check in his general office account but, claiming that he was extremely busy with a complex real estate matter, resisted Mr. Hart's requests for payment of his share. In late November or early December, the balance in Harrison's account fell below the amount owed to Hart. During that time Harrison wrote Hart a check that was returned for insufficient funds, apparently in violation of a representation by Harrison's bank that it would cover overdrafts. On December 20 Harrison paid Hart his share of the settlement, but it was not until two weeks later that he actually relinquished money for the medical bills he had agreed to pay. Although the BPR found that Harrison had "not consciously set out to misappropriate Hart's funds but rather did so as the result of his failure to keep proper records," *In re Harrison, supra* note 8, 461 A.2d at 1036, it concluded that he had violated the disciplinary rule that prohibits commingling as well as the rule that requires prompt disbursement of a client's funds when the client requests it. The BPR's findings, and its recommended sanction of a suspension for a year and a day, were adopted by this court.

Although the year-and-a-day suspension in *Harrison* may appear to be inconsistent

cases disbarment was imposed as a reciprocal sanction under Rule XI, § 18 of our Rules Governing the Bar. In seven others the attorneys were disbarred by consent under Rule XI, § 17.

**20.** *In re Goldstein, supra; In re Artis,* No. M–103–81 (D.C. February 25, 1982); *In re Branham,* No. M–27–78 (D.C. February 3, 1978).

**21.** *In re Harrison, supra* note 8; *In re O'Bryant, supra; In re Cefaratti,* No. M–140–82 (D.C. June 28, 1983); *In re Branham,* No. M–107–81 (D.C. August 31, 1982); *In re Schattman,* No. M–63–81 (D.C. June 2, 1981). In the *Branham* case suspension was ordered as a reciprocal sanction, but the suspensions in the other four cases were based entirely on conduct occurring in the District of Columbia.

with the lighter sanction in *O'Bryant*, which unlike *Harrison* involved deceitful conduct, there is a factual difference between the two cases that accounts for the difference in sanctions. O'Bryant was not guilty of misappropriation. Harrison, however, allowed his bank balance to fall below the total amount of money he held for his client, thereby misappropriating his client's funds. Respondent's conduct is comparable to that of Harrison, rather than O'Bryant; see note 8, *supra*. The longer suspension in *Harrison* signals this court's resolve to treat more severely those attorneys who not only commingle their clients' funds with their own, but misappropriate them as well. Even without this resolve, we would treat the instant case more severely than either *O'Bryant* or *Harrison* for two additional reasons. First, respondent violated other disciplinary rules besides the ones breached in those two cases.[22] Second, respondent's misconduct, unlike that of O'Bryant or Harrison, was not confined to one client. He acted deceitfully toward two different clients and misappropriated funds belonging to both. Although the misappropriations may not have been intentional,[23] we have held that a violation of DR 9–103(A) may occur even without intent. *In re Harrison, supra* note 8; *cf. In re James, supra*, 452 A.2d at 167. We therefore conclude that respondent Hines' conduct was more serious than either O'Bryant's or Harrison's, and merits a more severe sanction.

■ ■ There is obviously a large disparity between the hearing committee's recommendation of public censure and the BPR's proposal of a two-year suspension. However, our focus is on the BPR's recommendation, and our review of it is limited. *In re Alexander, supra*, 466 A.2d at 452. Under Rule XI, § 7(3), the BPR has broad discretion in fixing sanctions for disciplinary rule violations, and that discretion will

be curtailed only when it is abused. "The rule requires that we enforce a general sense of equality in the sanctions handed out, but it otherwise commands that we should respect the Board's sense of equity in these matters unless that exercise of judgment proves to be unreasonable." *In re Smith, supra*, 403 A.2d at 303; *accord, In re Alexander, supra*, 466 A.2d at 452; *In re James, supra*, 452 A.2d at 170; *In re Haupt*, 422 A.2d 768, 771 (D.C.1980). We find no unreasonableness in the BPR's recommendation; hence we adopt it and suspend respondent for two years.

■ We also adopt another recommendation of the BPR. On the last page of its report the BPR states:

[T]he District of Columbia Court of Appeals has not yet ruled that misappropriation of the sort engaged in in this case will ordinarily result in disbarment. We think that such conduct should result in disbarment, but only after the bar has been put on notice by the District of Columbia Court of Appeals that misappropriation of client funds in cases involving more than simple negligence will ordinarily result in disbarment even though the proof does not rise to the level of willful corruption.

We agree with the BPR that "misappropriation of client funds in cases involving more than simple negligence [should] ordinarily result in disbarment," and we take this occasion to notify the bar that in future misappropriation cases disbarment will ordinarily be the sanction imposed by this court. We stress the word "ordinarily," for every case must turn on its own particular facts. There may be instances of misappropriation which, for any number of reasons, may call for a lesser sanction. Nevertheless, the bar should take notice that from this moment on, in disciplinary cases involving attorneys who misappropriate their clients' funds, disbarment will be

---

**22.** Neither O'Bryant nor Harrison violated DR 7–101(A)(3). In addition, Harrison's conduct did not contravene DR 1–102(A)(4).

**23.** *Cf. In re Quimby*, 123 U.S.App.D.C. 273, 359 F.2d 257 (1966), in which an attorney was disbarred for intentionally misappropriating funds in two separate estates.

the norm unless it appears that the misconduct resulted from nothing more than simple negligence.

## VII

It is therefore ORDERED that respondent, Eugene P. Hines, is suspended from the practice of law in the District of Columbia for a period of two years, effective thirty days from the date of this opinion.