*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-BG-0601

IN RE BENJAMIN M. SOTO, RESPONDENT.

A Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 453728)

On Report and Recommendation
of the Board on Professional Responsibility
(Disciplinary Docket No. 2015-D087)
(Board Docket No. 20-BD-057)

(Argued May 25, 2023                                    Decided August 3, 2023)

*Peter R. Kolker*, with whom *Casey Trombley-Shapiro Jonas* was on the brief, for respondent.

*Theodore (Jack) Metzler*, Senior Assistant Disciplinary Counsel, for the Office of Disciplinary Counsel. *Hamilton P. Fox, III*, Disciplinary Counsel, *Julia L. Porter*, Deputy Disciplinary Counsel, *Myles V. Lynk*, Senior Assistant Disciplinary Counsel, and *Joseph C. Perry*, Assistant Disciplinary Counsel, were on the brief for the Office of Disciplinary Counsel.

Before ALIKHAN and SHANKER, *Associate Judges*, and FISHER, *Senior Judge*.

FISHER, *Senior Judge*: The Board on Professional Responsibility recommends that we suspend respondent Benjamin M. Soto from the practice of law for six months based on his conduct in a real estate transaction and the ensuing disciplinary investigation. The Board found that Soto had violated D.C. R. Prof. Conduct 8.1(a),

8.4(c), and 8.4(d). Soto takes exception to the finding that he violated Rule 8.1(a); he also argues that a lesser sanction is appropriate in any event. Disciplinary Counsel contends that a one-year suspension is warranted. We agree with the Board that Soto violated all three Rules and, because a six-month suspension is within the range of sanctions imposed for misconduct of this magnitude, we accept the Board's recommendation and suspend Soto for six months.

## I.    Background

Since 2002, Soto has owned and operated a real estate settlement company. In 2012, William Duggan hired Soto's company to help him obtain legal title to a property located at 2461 18th Street NW (the Property) where Duggan operated a bar and restaurant. Duggan wanted to use the Property as collateral for a bank loan to his soon-to-be formed company—Lenjeswil, LLC—but he could not do so because the Estate of Jack Littlejohn held title to the Property. This was a complicated transaction that included preparation of a deed in lieu of foreclosure because various loans made to Jack Littlejohn and secured by the Property had not been repaid. Over time, the resulting defaulted notes changed hands on multiple occasions. By the time Duggan sought to acquire title to the property, he asserted

that he had purchased the right to collect the balances due on the outstanding loans. The Littlejohn Estate was then reopened so that the Property could be transferred.

In December 2012, the Estate's personal representative—Homer Littlejohn—signed the deed and a related tax form. Homer's attorney—Ara Washington—also signed as a witness, and the signatures were notarized. Following his practice in foreclosures of this type, Soto prepared a deed which stated that the Property was being transferred from the Littlejohn Estate to Lenjeswil for "no consideration." The deed was not recorded at the time it was signed, however. When Duggan later reviewed the documents, he angrily objected to the recital of "no consideration" because (for complicated reasons we need not explain) it would increase the amount of transfer and recordation taxes he would have to pay.

After consulting the D.C. tax code and speaking with the Recorder of Deeds, Soto agreed with Duggan that the consideration figure could be changed. On February 19, 2013, Soto directed his employee to change the amount of consideration shown on the documents. To implement the change, a new first page of the deed was created that revised the amount of consideration from "no consideration" to $450,000 and removed all references to a substitute trustee (a third party exercising the right to foreclose on the deed of trust who should have remained

on the new deed for legal reasons). The original second page—containing the notarized signatures of Homer Littlejohn and Ara Washington—was then attached to the newly created first page. The second page of the tax form was also revised to reflect the new amount of consideration and the recalculated (lower) amount of taxes due. Soto did not obtain authorization from the signatories and the notary before making these changes.[1]

On April 3, 2013, the altered documents were recorded. Afterward, the probate court requested a copy of the recorded deed in connection with the closing of the Littlejohn Estate. Soto's employee then sent attorney Washington a copy of the recorded deed and tax form. Upon receipt, Washington noticed the discrepancies between what she and Homer Littlejohn had signed and the now-recorded deed and accompanying tax form.

---

[1] According to Duggan's affidavit, Homer consented to the changes over the phone and insisted on not wanting to return to Soto's office. Duggan's affidavit also states that when he called Washington, she consented, provided that there was "no financial impact on the estate." Despite Duggan's calls, the Board concluded that Soto "admittedly did not notify Ms. Washington of these alterations before filing them" and was "recklessly dishonest in that he consciously disregarded the risk that the alterations to the Deed and FP 7/C tax form would prejudice Ms. Washington and [Homer]."

Washington confronted Soto about the changes and requested documentary proof that Homer had received $450,000. Soto replied, "What discrepancy?" and asked if she was joking about the proof of consideration. In January 2014, a probate court auditor inquired about the consideration and why it had not been reported as an asset of the estate since the Property had previously been reported as a loss. Washington told the auditor that the recorded deed was not the deed that she and Homer had signed. The auditor requested more information; this prompted Washington and Homer to visit the Recorder's Office to rectify the situation, but Washington was told that there was nothing that she could do to change the recorded deed.

Washington tried to contact Soto to correct the deed, but Soto did not respond. The matter was referred to the Auditor-Master due to concerns about fraud in the reopened estate. Washington and Homer were ordered to appear at a status hearing where Washington testified that (1) neither Homer nor the estate was responsible for the changes to the deed, (2) no one had received $450,000 in consideration, and (3) court records for the estate showed a foreclosure on the property in March 1995. Following the hearing, the Auditor-Master referred the matter to Disciplinary Counsel "to investigate the recording of a deed." In his introductory remarks, the Auditor-Master explained that "[i]t appears from the record that Benjamin Soto,

Esq., a member of the bar, either changed the language of a previously executed deed, or caused it to be changed, in order to assist a grantee in paying less transfer taxes." The referral observed that "[i]f the deed was altered before it was filed, that act appears to be a forgery as defined in D.C. Code § 22-3241(a)(1)(A) and (B)." The Auditor-Master noted that he had not subpoenaed Mr. Soto, or anyone from his firm, to appear.

On March 25, 2015, the Office of Disciplinary Counsel sent its initial inquiry and copies of the Auditor-Master's report and referral to Soto, asking him to "provide a substantive, written response . . . to each allegation of misconduct." On May 15, 2015, Soto's counsel responded by letter and Soto certified that his counsel's statements were true and correct to the best of his knowledge. Their response sought to explain the changes to the deed, by which the Estate of Jack Littlejohn granted the property to Lenjeswil LLC.

Soto's response asserted that the "adjustment" to the deed "was a correction, not a falsification" and "there was no fraudulent intent." But the narrative implied that Lenjeswil was both the lender and the buyer with regard to the Property: "The lender was the grantee under the Deed and is also referred to herein as the 'buyer.'" Soto also stated that "the lender" had unsuccessfully tried to foreclose on the

Property when Jack Littlejohn owned it and that "the lender did not record a Substitute Trustee's Deed transferring title to the lender following the foreclosure." Additionally, Soto explained that the $450,000 in consideration "was based on the loan the buyer provided to the decedent" (Jack Littlejohn). Disciplinary Counsel asserted that these statements were intentionally false and misleading because Lenjeswil, which was created in 2012, neither foreclosed on the Property nor made any loans to Jack.

Disciplinary Counsel charged Soto with violations of Rules 8.1(a), 8.1(b), 8.4(b), 8.4(c), and 8.4(d) based on the unauthorized alterations and his response to the disciplinary inquiry. The Ad Hoc Hearing Committee found that Disciplinary Counsel proved the violations of Rules 8.1(a), 8.4(c), and 8.4(d) by clear and convincing evidence and recommended that Soto be suspended from the practice of law for six months. The Board agreed that Soto violated Rules 8.1(a), 8.4(c), and 8.4(d) and accepted the Hearing Committee's recommendation of a sanction.

## II. Standard of Review

When reviewing the Board's Report and Recommendation, we "shall accept the findings of fact made by the Board unless they are unsupported by substantial

evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(h)(1). "Substantial evidence means enough evidence for a reasonable mind to find sufficient to support the conclusion reached." *In re Thompson*, 583 A.2d 1006, 1008 (D.C. 1990) (per curiam). "[I]n considering the Board's 'findings of ultimate fact or conclusions of law, we owe them no deference; our review is de novo.'" *In re Bailey*, 283 A.3d 1199, 1205 (D.C. 2022) (quoting *In re Yelverton*, 105 A.3d 413, 420 (D.C. 2014)).

## III. Discussion

Respondent Soto does not contest the findings that he violated Rules 8.4(c) and 8.4(d) by altering the notarized documents. These rules provide that "[i]t is professional misconduct for a lawyer to: . . . [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation" or to "[e]ngage in conduct that seriously interferes with the administration of justice." D.C. R. Prof. Conduct 8.4(c)-(d). The Board found that Soto "violated Rule 8.4(c) when he directed the alteration of the notarized documents and filed them as if they were the original." Additionally, the Board "agree[d] with the Hearing Committee that [Soto] was dishonest in his dealings with Ms. Washington and Homer Littlejohn." Moreover,

there was clear and convincing evidence that Soto "seriously interfered [with] the administration of justice when he changed the consideration amount[,] which extended the probate proceedings and delayed the closing of the Littlejohn estate."

Soto argues, however, that he did not violate Rule 8.1(a) because—despite oversimplifying and omitting certain details of the transaction—his statement to Disciplinary Counsel was not false or knowingly false.  Soto further argues that a six-month suspension is too harsh because (1) the Board based its recommendation of that sanction partly on its finding of a Rule 8.1(a) violation (which he contests) and (2) similar conduct in other cases has resulted in lesser sanctions.  We first address Soto's exception to the finding of a Rule 8.1(a) violation and then address the appropriate sanction.

## A.    The Rule 8.1(a) Violation

We agree with the Board's conclusion that Soto violated Rule 8.1(a) because he (1) knowingly made a false statement to Disciplinary Counsel and (2) omitted critical details of a complex transaction to obscure his actions in altering the deed and tax form.  Rule 8.1(a) states that "a lawyer in connection with . . . a disciplinary matter, shall not: [k]nowingly make a false statement of fact."  Comment 1 to Rule

8.1 explains that "[l]ack of materiality does not excuse a knowingly false statement of fact. . . . [I]t is a separate professional offense for a lawyer knowingly to make a misrepresentation or omission in connection with a disciplinary investigation of the lawyer's own conduct." D.C. R. Prof. Conduct 8.1 cmt.[1]. "Knowingly" means "actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." D.C. R. Prof. Conduct 1.0(f).

Soto's 2015 response would lead a reasonable person to conclude that what transpired was a simple real estate transaction between Lenjeswil (the lender and buyer) and Jack Littlejohn. In reality, the transaction was complex and involved multiple parties over an extended period of time. We need not repeat all of the Hearing Committee's and Board's detailed factual findings. However, we recount the following pertinent details to explain why we agree with the Board's conclusion.

Before he died in 1993, Jack Littlejohn took out various loans against the Property that were recorded in promissory notes and secured by separate deeds of trust. After Jack defaulted, David Levin—who owned the defaulted notes at the time—attempted to foreclose on the Property in 1995. Levin died before he could complete the foreclosure, and his estate took ownership of the defaulted notes. When Duggan learned that the Levin Estate would sell the defaulted notes, he asked

his occasional business partner—Daniel Solomon—to purchase the notes through Solomon's company, Coles Farm Enterprises, LLC. In 1996, Coles Farm purchased the notes. Duggan, through his entity 2461 Corporation, then executed a $350,000 promissory note to Coles Farm in exchange for control of the defaulted notes and incidence of ownership of the building. Duggan assumed de facto ownership of the Property, made periodic mortgage payments to Coles Farm, and paid real property taxes owed to the District.

From 1996 to 2012, Coles Farm owned the defaulted notes but did not hold legal title to the Property and could not convey title to Duggan or his entities. In 2003, Coles Farm unsuccessfully attempted to foreclose on the Property. The next year, Coles Farm's substitute trustee purchased the Property at a foreclosure auction and executed a deed transferring the Property to Duggan's wife in exchange for her promise to pay $500,000. The deed was not recorded, however, and the Property remained in Jack's name although he had died in May 1993. After hiring Soto and convincing Homer to reopen the Littlejohn Estate to transfer the title, Duggan informally assigned 2461 Corporation's interest in the Property to Lenjeswil— which Duggan formed in November 2012.

Soto asserts that his statements to Disciplinary Counsel were not false because Duggan (or Lenjeswil) "stepped into the shoes" of the prior note holders, thus in essence becoming "the lender." But nothing in Soto's response to Disciplinary Counsel's inquiry indicated as much. The Board found that Soto's "statement describing a simple loan that was forgiven between two parties falsely indicated the identity of the actual parties to the transaction and suggested that the calculation of the $450,000 consideration was straightforward, accurate and above reproach." Soto "knew his initial statement to Disciplinary Counsel in 2015 was false" because he knew that Lenjeswil did not loan Jack money, did not attempt to foreclose on the Property, and did not fail to record a substitute trustee's deed.

Even if his statement was "technically true," the Board found that it was deliberately misleading for Soto to omit facts about other parties involved in the transaction and their interests in the Property. *See In re Krame*, 284 A.3d 745, 758 (D.C. 2022) ("[T]echnical truths may still violate [Rules 3.3(a)(1) and 8.4(c)] where they are intentionally misleading via omission.");[2] *see also In re Starnes*, 829 A.2d 488, 490 n.2 (D.C. 2003) (per curiam) (upholding a finding of Rule 8.1(a) violation

---

[2] The state of mind required to violate these rules is similar to the "knowingly false" requirement of Rule 8.1(a). Rule 3.3(a)(1) provides that "[a] lawyer shall not knowingly [m]ake a false statement of fact or law to a tribunal." Rule 8.4(c) states that "[i]t is professional misconduct for a lawyer to [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

and reasoning that "while Starnes claims that his admittedly misleading statements to the Admissions Committee were inadvertent and immaterial, the Board had sufficient evidence to conclude otherwise").

Soto argues that the omitted information was not necessary to answer "the central question" raised by the referral to Disciplinary Counsel: whether he committed the crime of forgery.[3]  However, as we have pointed out above, Comment 1 to Rule 8.1 explains that "[l]ack of materiality does not excuse a knowingly false statement of fact."  Moreover, the Board disagreed that Soto's omissions were immaterial—at least with respect to understanding the calculation of the consideration and resulting taxes.  It found that Soto's statement was deliberately misleading because Soto "knew he was oversimplifying the title issues which obfuscated his answer to Disciplinary Counsel's inquiry."  In particular, the Board found that Soto knowingly used the complexity of the transaction to obscure "his

---

[3] Disciplinary Counsel charged Soto with violating Rule 8.4(b) by committing the criminal act of forgery, but the Hearing Committee found that Disciplinary Counsel did not prove this violation by clear and convincing evidence.  The Hearing Committee did find that Soto's "filing of the altered documents without Ms. Washington's consent constitute[d] making, drawing, or uttering a forged written instrument."  Nevertheless, the Hearing Committee "decline[d] to find that [Soto] had an intent to defraud the D.C. government in light of the unusual preceding 16-year history of the [P]roperty at issue and [Soto]'s good faith belief that his estimated amount of consideration and the reduction in taxes were appropriate."

actions[] to include the significance of removing the reference to Coles Farm's attempted foreclosure and continuing interest in the Property."

Coles Farm's attempted foreclosure may have been, as Soto puts it, "null and void." But that does not justify obscuring Coles Farm's involvement, including the $500,000 transaction between Coles Farm and Duggan's wife. Soto's deliberate omissions concealed facts that would have aided Disciplinary Counsel in determining whether the altered document was actually a deed in lieu of foreclosure, whether the formula used for estimating the amount of consideration was proper, and whether the resulting tax calculations were accurate. All of these matters were within the scope of Disciplinary Counsel's inquiry. Thus, because of Soto's knowingly false statements and deliberately misleading omissions, we agree with the Board's conclusion that Soto violated Rule 8.1(a).[4]

---

[4] The Hearing Committee's finding that Disciplinary Counsel failed to prove that Soto had an intent to defraud the D.C. government does not preclude our conclusion that Soto knowingly made false statements and deliberately misled Disciplinary Counsel. It is true that a Hearing Committee's credibility findings about a respondent's state of mind can constrain our conclusion on the same ultimate fact. *See In re Krame*, 284 A.3d at 754 ("[A]lthough a respondent's state of mind might be an ultimate fact that is reviewed de novo, a Hearing Committee's credibility findings can still constrain the determination of ultimate fact."). But "it would be a legal mistake to conclude, from that premise, that [Soto] did not violate" Rule 8.1(a). *Id.* at 758. Although the Hearing Committee credited Soto's testimony that he had a "good faith belief that his estimated amount of consideration and the reduction in taxes were appropriate," "[t]hat credibility finding says nothing about whether

### B.     An Appropriate Sanction

We now turn to determining the appropriate sanction. The Board recommends a six-month suspension. Soto argues that we should "eliminate or reduce the recommended period of suspension." Disciplinary Counsel contends that we should impose a one-year suspension. We accept the Board's recommendation.

"The Board's recommended sanction 'comes to us with a strong presumption in favor of its imposition.'" *In re McClure*, 144 A.3d 570, 572 (D.C. 2016) (per curiam) (quoting *In re Baber*, 106 A.3d 1072, 1076 (D.C. 2015) (per curiam)). "Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *In re Goffe*, 641 A.2d 458, 463-64 (D.C. 1994) (per curiam). Ultimately, however, "the responsibility for imposing sanctions rests with this court." *In re Temple*, 629 A.2d 1203, 1207 (D.C. 1993). We base our determination of an appropriate sanction on several factors, including: "(1) the seriousness of the conduct, (2) prejudice to the client, (3) whether the conduct involved dishonesty, (4) violation of other disciplinary rules, (5) the attorney's disciplinary history, (6) whether the attorney has acknowledged his or her

---

[Soto] knowingly," *id.*, made false statements and deliberately omitted information in his response to Disciplinary Counsel years later.

wrongful conduct, and (7) mitigating circumstances." *In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013). Additionally, "we necessarily compare the instant case with prior cases in terms of the misconduct at issue." *In re Edwards*, 870 A.2d 90, 94 (D.C. 2005).

The Board carefully considered Soto's violations in light of these factors and thoroughly explained why a six-month suspension was consistent with comparable misconduct. The cases imposing lesser or greater sanctions cited by the parties— several of which the Board already distinguished—do not persuade us that the "Board's sense of equity" and "exercise of judgment" was unreasonable. *In re Haupt*, 422 A.2d 768, 771 (D.C. 1980) (per curiam). We agree with the Board that Soto's conduct is comparable to that in *In re Reback*, 513 A.2d 226 (D.C. 1986) (en banc), and dissimilar to *In re Powell*, 898 A.2d 365 (D.C. 2006) (per curiam).

In *Reback*, we concluded that a six-month suspension was appropriate when one of two lawyers, or a secretary acting at the lawyer's direction, signed a client's name to a complaint and had it notarized by falsely representing that the signature was genuine. 513 A.2d at 228, 233. The second lawyer filed the complaint, knowing that the signature was false. *Id.* at 228. In imposing the suspension, we stressed the seriousness of the lawyers' misconduct and how it prejudiced the administration of

justice. *See id.* at 231-32. Soto's alterations of previously executed and notarized documents is strikingly similar to the misconduct in *Reback*. And Soto's actions, which prolonged the probate proceedings and delayed the closing of the Littlejohn Estate, similarly prejudiced the administration of justice.

It is true, as Disciplinary Counsel notes, that some factors from *Reback* are not present here—namely, a lack of prior disciplinary history and the desire to avoid inconsistent sanctions for two lawyers in the same case. *See id.* at 229-30. But these differences do not alter our conclusion for two reasons. First, an attorney's prior disciplinary history—although highly relevant and material—should not "lead us to impose a sanction that is disproportionate to the violation." *Id.* at 231. We are satisfied that the Board considered Soto's public censure from nearly two decades ago, *see In re Soto*, 840 A.2d 1291, 1291-92 (D.C. 2004) (per curiam), and arrived at a proportionate sanction. Second, *Reback*'s concern for consistent sanctions between two lawyers is not a meaningful distinction. Instead, it is an example of the court's responsibility to impose proportionate sanctions for "equally egregious" or comparable misconduct. *In re Reback*, 513 A.2d at 230; *see* D.C. Bar R. XI, § 9(h)(1). Because we agree with the Board that Soto's misconduct was comparable to that in *Reback*, we see no reason to impose a greater sanction.

Soto's misconduct is also distinguishable from the misconduct in *Powell*, a case on which Disciplinary Counsel relies. There we imposed a one-year suspension with a fitness requirement for violations of the same rules that Soto violated. *See In re Powell*, 898 A.2d at 365-66. *Powell* is markedly different, however. Not only did *Powell* involve a criminal charge, the respondent also engaged in continuous and repeated misconduct. While under an interim suspension for failing to report his misdemeanor conviction to the D.C. Bar, the respondent failed to disclose his D.C. Bar membership and his interim suspension in his sworn application for admission to a federal district court. *Id.* Soto's misconduct—though undeniably serious—does not rise to the same level.

In the end, "comparisons between cases are inexact at best, and 'every case must turn on its own particular facts.'" *In re Hutchinson*, 534 A.2d 919, 926 (D.C. 1987) (quoting *In re Hines*, 482 A.2d 378, 386 (D.C. 1984)); *see also In re Schneider*, 553 A.2d 206, 212 (D.C. 1989). Based on all the circumstances, we are not persuaded that we should depart from the Board's carefully explained recommendation that Soto should be suspended for six-months.

## IV.    Conclusion

Accordingly, respondent Benjamin Soto is suspended from the practice of law in the District of Columbia for six months, effective thirty days from the entry of this order.  We direct Soto's attention to the requirements of D.C. Bar R. XI, § 14, and their effect on his eligibility for reinstatement.  *See* D.C. Bar R. XI, § 16(c).

*So ordered.*