**In re Stephen O. HESSLER, Respondent,**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 87-1233.**

District of Columbia Court of Appeals.

Argued June 1, 1988.
Decided Oct. 27, 1988.

Patricia Maher, with whom John M. Bray, Washington, D.C., was on the brief, for respondent Hessler.

Samuel McClendon, Asst. Bar Counsel, with whom Thomas E. Flynn, Bar Counsel, Washington, D.C., was on the brief, for Office of Bar Counsel.

Joan Goldfrank, Washington, D.C., for Bd. on Professional Responsibility.

Before NEWMAN, BELSON and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

One of the most basic rules of fiduciary conduct is that the fiduciary must not commingle his own property with that held by him belonging to another. In particular, fiduciary funds must be kept separate and deposited in a special account. This concept, as applied to lawyers, is embodied in our Disciplinary Rule 9-103(A), which states, in pertinent part, that "[a]ll funds of clients paid to a lawyer or law firm other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts ... and no funds belonging to the lawyer or law firm shall be deposited therein...."

All too often, we are presented with disciplinary violations of this seemingly simple and specific requirement.[1] Now before us is yet another such case. The attorney deposited his client's funds in his operating account; that is, the account in which he also deposited his own funds and wrote checks to pay his own bills.[2] Furthermore, the attorney misappropriated his client's funds by allowing the account balance on numerous occasions to fall below the amount of his client's funds in the account;[3] i.e., $912. However, the majority of the Board on Professional Responsibility adopted the hearing committee's finding that this misappropriation was not intentional or purposeful, but rather was negligent and inadvertent. It further adopted the hearing committee's conclusion, based on the finding that respondent had good reasons for delaying payment when requested, that a violation had not been

1. "[A]lthough the rule against commingling of client's funds with those of an attorney is fundamental, few ethical rules of conduct are more frequently breached by an attorney, and it appears that commingling is one of the most frequent bases for disciplinary action against attorneys." Annotation, *Attorney's Commingling of Client's Funds With His Own As Ground For Disciplinary Action—Modern Status,* 94 A.L.R.3d 846, 850 (1979) (footnote omitted).

2. In his brief to us, respondent says that, contrary to the statement in the Board report, he does not contend that the client's alleged con-

sent to this handling of the funds constitutes a defense to commingling. We therefore do not address that issue. (The hearing committee specifically found that the client did not consent to the deposit of the funds in respondent's operating account.) We reject respondent's commingling defense that in the circumstances of this case, the funds were analogous to a fee advance.

3. In *In re Harrison,* 461 A.2d 1034 (D.C.1983), we made it clear that misappropriation occurs in such situations regardless of intent; it is essentially a per se offense.

shown of the requirement of DR 9–103(B)(4) that a lawyer "promptly" deliver funds of a client upon request, an essentially fact-based determination.[4]

These findings are supported by substantial evidence of record and we accept them as our rules require. D.C.Bar R. XI § 7(3). The significant issue before us is the appropriate sanction to be imposed. The Board recommends a period of one year. While normally we accept the Board's recommended sanction, the situation before us is admittedly different inasmuch as this is the first case of its type since our decision in *In re Hines*, 482 A.2d 378 (D.C.1984). In that case, we announced that from that moment on "in disciplinary cases invoving attorneys who misappropriate their clients' funds, disbarment will be the norm unless it appears that the misconduct resulted from nothing more than simple negligence." 482 A.2d at 386–87.

We basically are in agreement with the majority's thoughtful analysis of the field in its report to us, annexed to this opinion. *In re Hines, supra,* is plainly a more egregious case than the one before us. The summary of the case and the relevant headnote in the Atlantic reporter are misleading in suggesting that the case involved only negligent misappropriation. To the contrary, the Board found with respect to one of the charges that Hines' actions demonstrated a "'reckless disregard'" for the status of the accounts in which he deposited his clients' money, which in turn gave rise to "'an inference that there was an intent on respondent's part to deal with and use funds escrowed for clients as his own.'" On the basis of this inference, the Board concluded that Hines had misappropriated funds in violation of DR 1–102(A)(4), which we upheld on appeal. *Hines,* 482 A.2d at 380.[5] The fact is that, especially after the *Hines* decision, an attorney who intentionally misappropriated funds would face the serious possibility of disbarment. *Cf. In re Buckley,* 535 A.2d 863 (D.C.1987).[6]

*In re Harrison,* 461 A.2d 1034 (D.C.1983) (year and a day suspension) resembles this case in that the attorney engaged in both commingling and inadvertent misappropriation. However, in *Harrison,* the attorney evaded the client's request for restitution for several weeks[7] by refusing to take calls or respond to letters. Furthermore, when Harrison finally paid his client, the check was returned for insufficient funds. Finally, during the investigation of the incident, Harrison misleadingly implied to bar counsel that the payment had been delayed because of an unexpected writ of attachment.

The case before us involves commingling and misappropriation through simple negligence, but no more. By using the phrase "no more," we do not mean to underplay the seriousness of the conduct here. It falls within the particularly sensitive field of proper activity by a lawyer in relation to his client's finances. The problem arises in the first instance because of the totally improper action of placing a client's funds in the attorney's own account. That action

---

4. We cannot agree with the common misconception in the Board's dissenting opinion that a simple stop-payment order at his bank would protect respondent in issuing a replacement check. If the original check had been negotiated to a holder in due course, respondent would have been required to make it good when the drawee bank refused to pay. D.C.Code §§ 28:3–305, 413 (1981); *see, e.g., Citizens Nat'l Bank of Englewood v. Fort Lee Sav. & Loan Ass'n,* 89 N.J.Super. 43, 213 A.2d 315 (1965).

5. Furthermore, two instances of misappropriation were involved and Hines was also found to have violated the prompt payment requirement of DR 9–103(B)(4), in connection with which he made deliberate misrepresentations violative of DR 1–102(A)(4).

6. Bar counsel reads *Hines* as treating attorneys who unintentionally misappropriate client's commingled funds because of "sloppy bookkeeping" on the same basis as intentional misappropriation, mandating disbarment here pursuant to the *Hines* warning. We cannot go so far as to say that mere negligence and inadvertence can never be found, as the Board did here, in a case where "sloppy bookkeeping" caused the misappropriation.

7. The actual period of time between the first request and the effective delivery of all the funds was close to three months.

alone puts the client's funds at risk,[8] regardless of the adequacy of the balance. As the Supreme Court of California has explained:

> The rule against commingling was adopted to provide against the probability in some cases, the possibility in many cases, and the danger in all cases that such commingling will result in the loss of the clients' money. Moral turpitude is not necessarily involved in the commingling of a client's money with an attorney's own money if the client's money is not endangered by such procedure and is always available to him. However, inherently there is danger in such practice for frequently unforeseen circumstances arise jeopardizing the safety of the client's funds, and as far as the client is concerned the result is the same whether his money is deliberately misappropriated by an attorney or is unintentionally lost by circumstances beyond the control of the attorney.

*Clark v. State Bar*, 39 Cal.2d 161, 168, 246 P.2d 1, 5 (1952) (quoting *Peck v. State Bar*, 217 Cal. 47, 51, 17 P.2d 112, 114 (1932)). By mingling client funds with the attorney's own, the client's funds become more difficult to trace and are subject to the risk that they may be taken by creditors of the attorney. The bank's right of setoff, for example, is by the weight of authority held to apply to such commingled funds where the bank has no notice of the fiduciary character of the funds. 4 SCOTT ON TRUSTS §§ 305.3, 324.4 (3d ed. 1967); Annotation, *Bank's Right to Apply Third Person's Funds, Deposited in Debtor's Name, On Debtor's Obligation*, 8 A.L.R.3d 235 (1966). A garnishment of the account could lead to prolonged delay in the client's receiving the funds, if indeed he could assert a priority right to them at all. *See* D.C.Code § 16–514 (1981).[9]

Moreover, even if traceable, it has been held that the true owner is entitled to no more than the lowest balance that existed during the time his funds were commingled in the fiduciary's personal account, 5 SCOTT ON TRUSTS, *supra*, at § 521, a fact that demonstrates the seriousness of even unintentional misappropriation and a risk that exists (for example, if deposited checks are not honored) even with careful management of an account.[10]

So serious has been the prohibition against commingling that it has been held that a fiduciary who does so becomes an absolute guarantor of the funds on deposit, so that if, for example, the bank fails, the fiduciary is liable. This sanction, plainly a penalty to prevent commingling,[11] moreover has survived the relaxation of the old "earmarking" rule which imposed a similar penalty if a fiduciary failed to label trust assets as such. 2A SCOTT ON TRUSTS § 180.2 (4th ed. 1987); Annotation, *Liability of Attorney for Loss of Client's Money or Personal Property in His Possession*

---

**8.** This is not the sole consideration. "Separation of the funds of a client from those of his lawyer not only serves to protect the client but also avoids even the appearance of impropriety."

**9.** We do not need to address here the issue of priority rights as between the true owner of the commingled funds and a levying creditor, trustee in bankruptcy, or the like. Not only actual, but potential, loss or difficulties are at stake. The commingling ban, as with the earmarking rule requiring identification of trust property, is designed, *inter alia*, "to afford the beneficiary the best means of tracing the property, should it be necessary to do so; and to protect the beneficiary against loss of the property or difficulty in asserting his rights to it should it be taken by creditors of the trustee." *Chapter House Circle v. Hartford Nat'l Bank & Trust Co.*, 121 Conn. 558, 186 A. 543, 545 (1936) (citing 3 Bogert, Trusts and Trustees, § 596 (1935)).

**10.** Thus, the argument fails that here, as was true in *Harrison*, an oral agreement with the bank respecting payment of overdrafts excuses the misappropriation, quite apart from other considerations such as the possibility of the agreement being revoked or the bank breaching the agreement. In any event, as we stated in *Harrison*, once the account balance falls below the amount of the client's funds therein, the attorney has effectively put the client's funds to his own unauthorized use, even if temporary; in effect, the attorney has taken an interest-free loan.

**11.** In a number of states, it is a misdemeanor for a trustee to commingle funds, even though the trustee had no intention to misappropriate. 2 SCOTT ON TRUSTS § 179.1 at 499–500 nn. 5 & 6 (4th ed. 1987).

*or Entrusted to Him,* 26 A.L.R.2D 1340 (1952). We emphasize the ban against commingling to alert the bar that in future cases of even "simple commingling," a sanction greater than public censure may well be imposed.

The case before us, of course, involves unintentional misappropriation as well, the seriousness of which we stressed in *Harrison*. In the abstract, such an action might well warrant a one-year suspension. Here, however, as the annexed Board report points out at pages 39–40, aggravating features are absent and no less than six undisputed mitigating factors must be taken into account.[12]

The Board report suggests that absent the signal that it interpreted *Hines* to send, a six-month suspension would have been felt appropriate. We did not mean in *Hines* to establish a flat rule for unintentional misappropriations in which mitigating factors would play no significant part. We conclude that under all the circumstances of this case and in particular the numerous mitigating factors, the purposes of bar disciplinary determinations will be sufficiently served by a suspension of six months.

*So ordered.*

### APPENDIX

### DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBILITY

Bar Docket No. 45–85

IN THE MATTER OF: STEPHEN O. HESSLER, RESPONDENT.

### REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

In this case, Bar Counsel filed a Petition charging Respondent with four violations of the Disciplinary Rules:

—"Disciplinary Rule 9–103(A) because ... Respondent commingled client funds with his own" [*commingling*];

—"Disciplinary Rule 9–103(A) because Respondent failed to maintain the [client's] ... funds ... on deposit" [*unintentional* misappropriation];

—"Disciplinary Rule 1–102(A)(4) because the unauthorized use of his client's funds ... constituted dishonesty" [*honesty* or intentional misappropriation]; and

—"Disciplinary Rule 9–103(B) because Respondent failed to promptly pay ... funds to ... the client" [failure *promptly* to pay].

After evidentiary hearings on two different days,[1] the Hearing Committee sustained the two alleged violations involving commingling and unintentional misappropriation and rejected the other alleged violations for lack of clear and convincing evidence. The sanction recommended by the Hearing Committee was suspension for one year.

For the reasons set forth in this Report, the Board on Professional Responsibility concurs with all of the Hearing Committee's findings and conclusions concerning the alleged violations, *i.e.,* Respondent's conduct involved both commingling and unintentional misappropriation but did not constitute either dishonesty or a failure promptly to pay the client's funds. The Board also concurs with the Hearing Committee's view that the sanction should be short-term suspension (less than a year and a day) because Respondent's misconduct does not show any general unfitness of the type that justifies an independent reinstatement proceeding, such as is required after a long-term suspension (year and a day, or more). The Board concurs with the Hear-

12. We would add one other. The hearing committee, and perhaps the Board majority, took the view that the strictures of *Hines* applied to respondent because that case was decided on September 26, 1984. However, the act of commingling occurred on August 1, 1984, and the check mailed on August 17, 1984. After December 8, the date respondent first could no longer reasonably assume she had received the check, he was moving to repay her. We are reluctant to require respondent to bear the full force of *Hines* or, of course, of this opinion, as we shall in future cases.

1. The transcript of hearings on July 3, 1986 is herein identified as "Tr. I" and on July 22, 1986 as "Tr. II."

ing Committee's report that suspension for one year would be an appropriate sanction for the Court of Appeals to enter in this case.

## I. *SUMMARY OF EVIDENCE ESTABLISHING RESPONDENT'S MISCONDUCT*

All of the charges in this case arise out of Respondent's representation of "Betty Cox" in a landlord/tenant case. Betty Cox is the name used by Hinda Exler in conducting the rental operations of a sole proprietorship under the tradename of D.C. Property Management.

The dealings between Respondent and Ms. Cox did not fit the customary pattern of lawyer-client relations. As the Hearing Committee found:

"[Respondent] knew neither Ms. Cox's real name nor her address. All mail was sent to a post office box. Moreover, he had never met his client. Although he asked to meet with her, she refused."

Hr'g Com.Rep. at 4.

In the fall of 1983, Betty Cox retained Respondent by telephone to institute, for non-payment of rent, an eviction proceeding against the tenant in an apartment owed by Betty Cox. Respondent prepared and filed an appropriate complaint, and the tenant thereafter filed an answer and counterclaim based on alleged Housing Code violations. Prior to being retained in this lawsuit, Respondent had provided legal services to Ms. Cox in uncontested matters for which he charged fees at the rate of $50 per hour. When it became apparent that this case would be contested, Respondent informed Ms. Cox by letter that his fee would charged "on an hourly basis at $75 per hour." RX 5.[2]

After the lawsuit had been filed, Respondent promptly sought and obtained a protective order from the court which required the tenant to make rental payments to be held in the Court Registry during the pendency of the litigation. Throughout the case, Respondent communicated with Ms. Cox by telephone and letter to keep her informed of developments in the litigation, including the possibility of settlement. For example, in a letter dated March 23, 1984, Respondent reported to Ms. Cox that the case could be settled by her agreement to forego one month's rent amounting to $250. Respondent "strongly" recommended such a settlement because it would be "absolutely futile to spend two or three days in a jury trial arguing over $250." RX 10. Ms. Cox refused to accept such a settlement and directed Respondent to continue with the litigation. Tr. II at 19.

As the litigation progressed in its pre-trial stage, Respondent billed Ms. Cox from time to time for his accumulated legal fees. Thus, on March 1, 1984, Respondent sent Ms. Cox a bill for $100 to cover his court appearance on a motion that had recently been argued. RX 9. Then, on May 25, 1984, Respondent sent another statement covering additional legal services amounting to $350, and since Ms. Cox had not paid the prior statement of $100, the total amount payable to Respondent was then $450. RX 11.

In July 1984, the tenant failed to make the required rental payment into the Court Registry, whereupon Respondent promptly filed a Motion for Judgment of Possession and Costs, which was thereafter set for argument on July 30, 1984. Prior to the scheduled argument, counsel for the tenant made a settlement proposal that was ultimately accepted both by Ms. Cox and the tenant. This settlement included three points pertinent to this disciplinary proceeding: (1) Ms. Cox agreed to make certain specified repairs to the apartment by August 31, 1984; (2) the rental payments held in the Court Registry would be released to Ms. Cox with the exception of $90 that would be paid to the tenant in satisfaction of the counterclaims; and (3) the entire lawsuit including all of the counterclaims against D.C. Property Management would be dismissed. Hr'g Com.Rep. at 3.

---

**2.** "RX" refers to Respondent's Exhibits admitted in evidence by "BX" refers to Bar Counsel's or Petitioner's Exhibits.

On the following day, July 31, 1984, Respondent forwarded to Ms. Cox a copy of the praecipe setting forth the settlement, together with Respondent's letter that fully explained the terms of the settlement agreement. BX 7. With this letter Respondent enclosed a statement for legal fees in the amount of $500 for additional legal services, and it was called to Ms. Cox's attention that Respondent's total fee was now $950 for handling the entire case. Then, Respondent's July 31 letter specifically stated:

We shall deduct our fee [$950] from the money released from the Court Registry and send the balance to you.

*Id.*

Based on the July 31 letter and corroborating testimony at the hearing, the Hearing Committee found that "[t]here was an agreement between Respondent and Betty Cox that Respondent was to withhold his legal fee from the money sent from the Court Registry and then forwarded the balance to her." Hr'g Com.Rep. at 4. The Committee's findings of fact concerning the settlement and the agreed-upon disposition of the settlement funds reflected generally the evidence and testimony of Respondent on this phase of the case. *See* RX 14; Tr. I at 57. The Hearing Committee did not credit the contrary testimony of Ms. Cox. *See* (Tr. II at 6–8); 26–27.

Shortly after the settlement, Respondent received on August 1, 1984, a check for $1,862 from the Court Registry, which was the settlement amount due to Ms. Cox from funds in the Court Registry. On the same date, Respondent deposited this check into his operating bank account. Thereafter, on August 17, 1984 Respondent prepared and mailed a check to Betty Cox in the amount of $912, which reflected the full amount received from the Court Registry minus

the unpaid legal fees of $950 due to Respondent. Hr'g Com.Rep. at 3–4.

It is undisputed that Respondent's check was prepared and mailed to Ms. Cox on or about August 17, 1984, and it is likewise undisputed that this check was never negotiated by Ms. Cox. Ms. Cox testified that she never received Respondent's letter forwarding the check for $912. Tr. II at 29. This indicates that the letter with the check was lost in the mail or possibly misplaced within the office of D.C. Property Management.[3] In any event, it is unlikely that Ms. Cox would have been satisfied even if she had received the August check for $912. As explained in her testimony, Ms. Cox insisted that she was entitled to receive the full amount of the $1,862 obtained by Respondent from the Court Registry and that her payment of Respondent's fee should be handled thereafter in a separate transaction. Tr. II at 6–7, 27–28.

On or about September 21, 1984, Ms. Cox telephoned Respondent to inquire about the status of the various payments that were due her under the settlement. Respondent explained in this telephone discussion, and thereafter reconfirmed in a letter to Ms. Cox dated September 25, 1984, that the overall settlement provided for payments to her from three different sources: (1) a payment from the Court Registry with respect to "all rents through June 1984" that had been deposited by the tenant with the Court Registry; (2) a payment directly from the D.C. Government with respect to the July rent; and (3) payments directly from the tenant with respect to the August and September rents. BX 8. Respondent's letter of September 25, 1984 further explained that "my attorney's fees ... were deducted from the money in the Court Registry and the balance was sent to you" in the letter of August 17, 1984. *Id.*

---

**3.** According to Ms. Cox's testimony, she did not receive two other letters relating to Respondent's legal fees. Thus, Ms. Cox testified (Tr. II at 23) that she never received Respondent's letter of January 31, 1984 (RX 5), in which she was advised that Respondent's fee would be charged at an hourly rate of $75 per hour. Similarly, Ms. Cox testified (Tr. II at 29) that she

did not receive Respondent's statement for legal fees dated March 1, 1984 (RX 9). Together with the August 17, 1984 letter with the check, Ms. Cox testified that she did not receive three letters mailed to her by Respondent. However, Ms. Cox apparently received all of Respondent's other letters sent to her via mail.

The Hearing Committee found that after the telephone discussion on September 21, 1984, "Respondent did not hear again from Ms. Cox again until about December 8, 1984, when he received a letter from her inquiring about her money...." Hr'g Com.Rep. at 4. Respondent testified that in response to Ms. Cox's December 8 letter, he "wrote [to her] a day or two later—that's an Exhibit." Tr. I at 65. However, the exhibits in the record do not include either the December 8 letter from Ms. Cox or the subsequent letter from Respondent. Nor does the record reveal anything concerning the substance of these written communications in mid-December 1984. However, the record does disclose that several days later, on December 28, 1984, Ms. Cox spoke by telephone with attorney William Smink to obtain his assistance in this matter. Mr. Smink testified that "at the time when she called us [on December 28] there were allegations [by Ms. Cox] over the fee dispute. She wanted the full amount—she wanted the $1,862—she was hot...." Tr. I at 29.

After being retained by Ms. Cox, Mr. Smink thereafter contacted Respondent by telephone on January 2, 1985. According to Mr. Smink's testimony, Respondent explained he had told Ms. Cox in his letter of July 31, 1984 that he was going to take his fee out of the Court Registry funds and that his check for the balance had been placed in the mail by him on August 17, 1984. Respondent also informed Mr. Smink that, as of the time their discussion on January 2, 1985, Respondent's "books and records were with his bookkeeper, and as soon as he got them back he would look into it." Tr. I at 29–30. On January 12, 1985, Mr. Smink spoke to Respondent again, explaining that "Betty Cox had called [and] ... was upset that nothing had happened in that 12–day period." Tr. I at 30. According to Mr. Smink's testimony, "most of that conversation dealt with the fee dispute aspect," and Respondent "said the books and records were still with the bookkeeper and that he'd get on it." Id.

The next telephone discussion between Mr. Smink and Respondent occurred on January 25, 1985. At that time, Respondent informed Mr. Smink that Respondent "had just received the books and records back from the bookkeeper and that he would look over them over the weekend and would either submit a canceled check as proof of payment or re-issue a check." Tr. I at 30–31. Respondent then determined that his prior check had not been negotiated, and on February 2, 1985, Respondent "messengered a [new] check" for $912 to Mr. Smink's office. Tr. I at 31. Respondent's new check was accompanied by "a letter detailing basically what had happened in the case [including] ... copies of his ledger ... showing a check had in fact, according to the ledger, been drafted to D.C. Properties" in August of 1984. Id.

Respondent's letter transmitting the new check for $912 offered an alternative approach designed to satisfy Ms. Cox's contention that she was entitled to receive *all* of the $1,862 in the Court Registry and that Respondent's fee should be handled by a separate payment. Thus, Respondent's letter to Mr. Smink, enclosing the new check for $912, stated that if Ms. "Cox will place in your hand [Mr. Smink] a check for $950 to my order for fees, then I will give to you a check for $1,862." BX 9.

Respondent's alternative approach to the fee dispute was not accepted by Ms. Cox. Mr. Smink then transmitted the new check for $912 to Ms. Cox with a letter stating "that she could file an action in Small Claims Court or with the Fee Arbitration Board" if she was still dissatisfied with Respondent's fee. This letter from Mr. Smink went on to suggest that Ms. Cox probably "would fare better with the Arbitration Board". Tr. I at 31.

As set forth in the Hearing Committee's findings, Ms. Cox received Respondent's new check for $912 on February 2, 1986, and this check was thereafter negotiated by Ms. Cox on February 14, 1985. Hr'g Com.Rep. at 5. The Hearing Committee also found that between the date Respondent deposited the settlement funds from the Court Registry into his own operating bank account and February 14, 1985, "Respondent's bank balance on numerous occasions fell below $912", the amount owed to

his client. *Id.* The Hearing Committee further found:

> Respondent was not aware that his bank balance on these occasions was below $912 (Tr. I, pp. 102, 106), because he did not keep a running balance on his operating account. He kept only a rough estimate.... He did not balance the bank statements himself, but rather sent them to his bookkeeper as they came in.

*Id.* The Committee also found that "Respondent had an informal arrangement with his bank whereby the bank would cover overdrafts." *Id.*

Throughout the time frame pertinent to this disciplinary proceeding, Respondent was a sole practitioner and had no administrative support staff to handle financial matters other than the bookkeeper who reviewed Respondent's checkbook from time to time and balanced it. The bookkeeper was not an employee of Respondent and did not work in Respondent's office. Instead, the bookkeeper had an independent office in New Carrollton, which was several miles away from Respondent's office. Moreover, in December 1984 and January 1985, Respondent was in the process of moving his office and becoming associated with a law firm which, according to the Hearing Committee, has "remedied" the administrative problems of his solo practice that led to the mishandling of the client's funds in this case.

## II. *RESPONDENT'S VIOLATIONS OF THE DISCIPLINARY RULES*

The Hearing Committee concluded that Respondent's conduct constituted violations of the Disciplinary Rules prohibiting commingling and inadvertent misappropriation but did not amount to violations involving dishonesty or failure promptly to pay funds owed to a client. The Board agrees.

### A. *Disciplinary Rule 9–103(A)—Commingling*

DR 9–103(A) requires all client funds to be deposited in an identifiable bank account, and "no funds belonging to the lawyer or law firm shall be deposited there-

in....", except that funds belong in part to the client and in part to the lawyer "must be deposited therein...." This Rule prohibits "commingling", which is a disciplinary offense that "is committed when a client's money is intermingled with that of his attorney and its separate identity is lost so that it may be used for the attorney's personal expenses or subjected to claims of its creditors." *See Black v. State Bar of California,* 57 Cal.2d 219, 18 Cal.Rptr. 518, 522, 368 P.2d 118, 122 (1962).

The settlement funds of $1,862 from the Court Registry belonged in part to Betty Cox and in part to Respondent. Therefore, Respondent violated DR 9–103(A) when he deposited these in his operating bank account.

Respondent raises two legal arguments as defenses to the commingling charge. First, Respondent contends that the monies received from the Court Registry were analogous to a fee advance and therefore could be properly deposited in his operating account.[4] Since the possibility existed that Ms. Cox might fail to make the repairs required by the settlement, and since the Superior Court had retained jurisdiction to reopen the case if such repairs were not completed by August 31, 1984, the argument is that "Respondent had reason to believe that he would incur additional [repair] costs on behalf of his client" for which he could use the funds and that therefore the "status of the funds ... was analogous to the status of a ... a fee advance." Resp.Br. at 12. Respondent argues that the same policies reflected in D.C. Legal Ethics Opinion 113, which allow an attorney to deposit a fee advance into his operating account, should also apply to this situation. *Id.*

As the Hearing Committee correctly observed, Respondent's argument is undercut by his own conduct. Respondent disbursed $912 to Ms. Cox on August 17, 1984, and the record has no evidence showing that the repairs to the rented apartment had been completed by that date. The repairs did not have to be completed until August

---

4. *See* D.C. Legal Ethics Op. 113.

31, 1984. BX 6. Had Respondent considered the funds from the Court Registry to be analogous to a fee advance, he would not have made a payment to Ms. Cox without *first* determining that the repairs had been made in the leased apartment.

Respondent's second argument is that no improper commingling occurred because Ms. Cox consented to his depositing the funds into his operating account. (Ans. p. 5; Tr. I at 9). The Hearing Committee properly rejected this argument on the ground that consent is not a legal defense to commingling. The disciplinary rule is explicit: there is no provision allowing commingling based on client consent. *See Archer v. State*, 548 S.W.2d 71, 74 (Civ. App.1977).

Accordingly, since it is undisputed that Respondent received funds from the Court Registry on behalf of Ms. Cox and then deposited those funds in his own operating bank account, the Board concurs with the Hearing Committee's conclusion that Respondent commingled his client funds in violation of DR 9–103(A).

B. *Disciplinary Rule 9–103(A)—Inadvertent Misappropriation*

Respondent's misappropriation in this case is based strictly on bank statements showing the daily balance of Respondent's operating account. As the Hearing Committee found this evidence that Respondent's bank account dropped below $912 on several days during the period from August 1, 1984 through February 14, 1985.

A lawyer commits misappropriation in violation of DR 9–103(A) by "any unauthorized use of client's funds entrusted to him, including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Harrison*, 461 A.2d 1034, 1036 (D.C. 1983). Accordingly, even though Respondent did not know that his bank balance dipped below $912, the bank statements showing the daily balance in Respondent's account as being less than $912 on several different days are, standing alone, sufficient to constitute clear and convincing evidence of Respondent's inadvertent misappropriation of client's funds in violation of DR 9–103(A).

Respondent argues that there was no misappropriation because no check of his payable to Ms. Cox was ever returned for insufficient funds and because he had an informal arrangement with his bank for overdraft protection. Respondent contends that this case is different from *Harrison* in that Respondent's bank never returned one of his checks for insufficient funds where as the bank in *Harrison* did return checks for insufficient funds despite the overdraft protection arrangement. The conduct of a bank pursuant to an overdraft arrangement cannot and should not be the determinative factor in evaluating an attorney's compliance with ethical requirements. As the Hearing Committee correctly observed, the overdraft protection argument fails to recognize that the purpose of the disciplinary rule prohibiting commingling is not only to protect clients from *actual* loss but also to shield clients from exposure to *potential* loss as well.

Respondent further argues that the Hearing Committee's finding of inadvertent misappropriation is inconsistent with the Court's determination in *In re Jones*, [521 A.2d 1119] Dkt. No. 86–802 (D.C.App. Sept. 4, 1986). Respondent misconstrues the facts in *Jones*. The attorney in *Jones* did not have adequate records properly to account for all funds that she had expended for the benefit of the client, but the evidence nonetheless established that the attorney had *not used* any of the funds for an unauthorized purpose. Accordingly, *Jones* is factually different from the instant case.

In sum, when the daily balance in Respondent's operating bank account fell below the amount he owed to Ms. Cox, misappropriation then occurred despite Respondent's lack of knowledge that his bank account dipped below such amount. The Board therefore concurs with the Hearing Committee that Respondent's conduct constituted inadvertent misappropriation in violation of DR 9–103(A).

## C. *DR 1–102(A)(4)—Dishonesty*

Lawyers are prohibited by DR [1–]102(A)(4) from engaging in conduct "involving dishonesty." Unlike the offense of unintentional or inadvertent misappropriation encompassed by DR 1–103(A), where "improper intent is not an element", *In re Harrison*, 461 A.2d at 1036, a "dishonesty" offense under DR 1–102(A)(4) requires proof of intent.

In this case, the Hearing Committee found that "Respondent herein had an honest, though erroneous, belief that the settlement funds he received from the Court Registry could properly be deposited in his operating account." Hrg.Com.Rep. at 11. In *In re Harrison*, 461 A.2d 1034 (D.C. 1983), the court held that misappropriation resulting from negligence or inadvertence (in keeping up to date with the running balance of a bank account) is not sufficient to establish the intent element of a "dishonesty" violation. As the Court of Appeals subsequently noted in *In re Hines*, 482 A.2d 378, 386 n. 2 (D.C.1984): "Harrison's conduct did not contravene DR 1–102(A)(4)."

In this case, the Hearing Committee's finding, that "Respondent's misappropriation was not intentional or purposeful, but rather was negligent and inadvertent" [5], is supported by substantial evidence in the record as a whole and is therefore adopted by the Board. Accordingly, the conclusion is inescapable that Respondent did not commit any act of "dishonesty" in violation of DR 1–102(A)(4).

## D. *Disciplinary Rule 9–103(B)(4)—Failure to Promptly Pay Client's Funds*

As set forth in DR 9–103(B)(4): "A lawyer shall ... promptly pay ... to the client ... funds ... in the possession of the lawyer which the client is entitled to receive." The Hearing Committee found that Respondent, after depositing the settlement funds in his operating account on or about August 1, 1984, prepared and mailed a check to his client on August 17, 1984. The Board is unanimous in its conclusion that *if* Ms. Cox had received and successfully negotiated the check mailed to her August 17, there would have been no violation of the "promptly" requirement of DR 9–103(B)(4). However, this did not occur.

Instead, on September 21, 1984, Ms. Cox telephoned to inquire about the status of the funds to be paid to her under the settlement agreement, and Respondent then told Ms. Cox that he had mailed a check to her for the net amount she was to received from him. A few days later Respondent confirmed the substance of this telephone discussion in a letter which explicitly invited Ms. Cox to contact Respondent's assistant if she had any further question. BX 8. The Hearing Committee found that after the telephone discussion on September 21, 1984, "Respondent did not hear from Ms. Cox again until December 8." Hrg.Com.Rep. at 13. Accordingly, for a period of two and a half months up to December 8, Respondent reasonably assumed that she had received the check. As the Hearing Committee found: "After writing the letter to Ms. Cox on September 25, Respondent had no reason to believe she had not received the check he mailed her on August 17." *Id.*

In light of the above findings of the Hearing Committee, all members of the Board agree that as late as December 8, 1984, Respondent had not yet committed any violation of the "promptly" requirement in DR 9–103(B)(4), despite an elapsed period of over three months from the date of Respondent's receipt of the settlement funds. Accordingly, the Board is unanimous in its view that the appropriate period to evaluate Respondent's conduct under the "promptly" requirement of DR 9–103(B)(4) began on December 8, 1984 and ended on February 2, 1985, when Respondent sent his client a second check for the amount due to her.

The dissenting opinion of the Board uses a mechanical test based on counting "fifty-six days" from December 8 to February 2, and the opinion then concludes that "whatever that word ["promptly"] means, it does not mean" fifty-six days. Dissenting Op.

---

5. Hrg.Com.Rep. at 10.

infra at 718. According to the dissent, fifty-six days was too much because:

> All Respondent had to do was move expeditiously to determine whether or not his client had cashed the [first] check. Had he done so, he would have discovered that she had not. Thereafter, a simple stop order at his bank and a new check issued to his client would have satisfied his ["promptly"] obligation under the Code.

*Id.* There are several flaws in this fifty-six days-was-too-much argument.

One major flaw is that the argument just brushes aside all of the findings of the Hearing Committee concerning the pertinent facts both prior to and after December 8. Clearly, a proper evaluation of the delay *after* December 8 cannot be isolated from the events that occurred *before* that date. Respondent had in fact prepared and mailed to his client on August 17, 1984 a check for $912, which was the total amount due to her. However, the client continued to insist that she was entitled to $1,862 and that Respondent's "exorbitant" fee of $950 should be handled in an entirely separate transaction. Tr. II at 6–7, 34; Tr. I at 29.

Moreover, the Hearing Committee did not credit Ms. Cox's testimony that she had "several conversations" with Respondent after September 25. Tr. II at 10. Instead the Committee found: "Respondent herein neither avoided his client, nor wrote her a bad check. His delay was not part of a dishonest scheme." Hrg.Com.Rep. at 16. Even more importantly, the Hearing Committee also found that as a result of the events prior to December 8, Respondent

> ... was lulled by the client's failure to contact him for over two months into thinking that she did not consider the matter particularly urgent.

*Id.*

A mechanical approach of just counting fifty-six days after December 8 also fails to give due consideration to the circumstances that confronted Respondent during that fifty-six day period. Foremost among those circumstances is the fact that Respondent was then a solo practitioner. Perhaps it would be appropriate for the Board to take "judicial notice" of the fact that an attorney in a large law firm with an ample administrative support staff should be able "expeditiously" to determine the status of a previously issued check and then obtain a stop order from the bank in a period less than fifty-six days. However, the Board would not be justified in making the *assumption* that a period of fifty-six days (which includes Christmas/New Year holidays) is *on its face* so excessive for a *solo* practitioner that it cannot satisfy the "promptly" requirement of DR 9–103[B](4) *as a matter of law.* Yet, there is no other way to brush aside the Hearing Committee's conclusion that "Respondent herein had good reasons for his delay in writing a second check to replace the one sent out earlier." Hrg.Com.Rep. at 16.

The record shows not only that the client's conduct prior to December 8 had "lulled" Respondent into thinking his client did not regard the matter as being "particularly urgent." The record also establishes, and the Hearing Committee found, that in the period *after* December 8, Respondent "needed time to obtain the bank records from his bookkeeper," and Respondent was also "in the midst of setting up a new partnership." Hrg.Com.Rep. at 16.

The dissenting opinion urges that "[i]t is unproductive to attempt in this case to define exactly what the word 'prompt' means in the context of DR 9–103(B). Op. at 12. To the contrary, as the Hearing Committee noted, a decision on the "promptly" issue under DR 9–103(B)(4) must depend upon the facts of each case" because the "common thread" in all cases where an attorney failed to meet the "promptly" requirement is that "the delay was inexcusable" when considered in light of all the pertinent circumstances. Hgr. Com.Rep. at 15. For example, in *Harrison,* the Board found, and the Court of Appeals agreed, that the attorney was *"intentionally evading* his client" in order to delay the payment of funds belonging to the client. 461 A.2d at 1035 (emphasis added). In this case, however, the Hearing Committee expressly found that Respon-

dent *did not avoid* his client. Hrg.Com. Rep. at 16.

Moreover, in *Harrison* the duration of the inexcusable delay in paying the client's funds continued without interruption from October 12 to January 13, a period of almost three months. During such period, the attorney in *Harrison* wrote a total of 11 checks that were returned for insufficient funds, despite the alleged overdraft agreement with the bank. Then, to exacerbate matters even more, the attorney in *Harrison* misrepresented to Bar Counsel that the delay in paying his client was caused by "an unexpected writ of attachment" on his bank account arising out of an "unrelated incident," when in fact this attachment had not even been served at the time of the dishonored check issued to his client. This misrepresentation in *Harrison* was sufficient to induce Bar Counsel to dismiss the client's initial complaint. There are no comparable facts in this case.

In sum, we agree with the Hearing Committee's conclusion on the "promptly" issue. Hgr.Com.Rep. at 16. Under the particular circumstances confronting Respondent both before and after December 8, Bar Counsel's charge that Respondent failed "promptly" to pay the settlement funds in violation of DR 9–103(B)(4) is not supported by clear and convincing evidence, and the Hearing Committee's rejection of this alleged violation must therefore be sustained by the Board. Board Rule 13.6.

## III. *RECOMMENDED SANCTION*

In recommending a sanction, the Board is constrained by the requirement of Section 7(3) of Rule XI that the Court of Appeals will not impose any sanction that "would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." Thus, the Board's recommended sanction, if it is to be adopted by the Court, must have a rational basis in relation to sanctions imposed in other cases involving disciplinary violations generally comparable to those in the case at hand.

### A. *Legal Analysis of Pertinent Precedents on Sanctions In Commingling/Misappropriation Cases*

An analysis of the pertinent precedents in commingling/misappropriation cases reveals four categories of sanctions, depending on the severity of the misconduct: (1) public censure for simple commingling; (2) short-term suspension (one year or less) in cases involving commingling *plus* one or more additional serious violations; (3) long-term suspension (year and a day, or more) for commingling, *plus* unintentional misappropriation, and *plus* other serious violations of the Disciplinary Rules; and (4) disbarment for commingling plus *intentional* misappropriation amounting to dishonesty or fraud. For the reasons set forth below, the Board concludes that Respondent's misconduct here fits within the general range of the misconduct in category (2) cases where short-term suspension was imposed, and the consistency requirement of Rule XI therefore mandates that the sanction in this case should be short-term suspension (one year or less).

As to the first category of pertinent precedents on sanctions, *In re Gilchrist*, 488 A.2d 1354 (D.C.1985), is the most recent example of commingling for which the mildest form of sanction (public censure) was imposed. There, the record established that the attorney had violated DR 9–103(A)(2) by commingling his client's funds with his own personal funds and had also violated DR 9–103(B)(3) by failing to maintain proper records of client's funds. Although the documentary evidence indicated an *apparent* intentional misappropriation of client's funds sufficient to constitute "dishonesty" in DR 1–10[2](A)(4), the attorney's testimony provided an explanation of how the funds had been used, and when this testimony was credited by the Hearing Committee, it was sufficient to justify the finding that Bar Counsel had failed to support the alleged dishonesty violation by clear and convincing evidence.

The Court of Appeals accepted the Board's recommendation in *Gilchrist* and imposed public censure as the sanction. In so doing, the Court relied on its prior deci-

sion in *In re Artis*, No. M–103–81 (D.C.C.A. Feb. 25, 1982), where public censure had been imposed for three separate incidents of simple commingling for the same client, unaccompanied by misappropriation or dishonesty.

The second category of pertinent precedents on sanctions consists of cases involving commingling *plus* additional serious violations. For these cases, the sanction is short-term suspension. For example, in *In re Dwyer*, No. M–61–80 (D.C.C.A. June 9, 1981), the attorney's misconduct consisted of commingling in violation of DR 9–103(A), plus neglect in violation of DR 6–101(A)(3), plus inadequate preparation in violation of DR 6–101(A)(2). The Board recommended, and the court imposed, suspension for a period of three months. In arriving at this recommended sanction, it was stressed that attorney's violations did not involve any misrepresentation, deceit or dishonesty.

Another precedent in the second category is *In re O'Bryant*, 425 A.2d 1313 (D.C. 1981). There the attorney not only commingled his client's funds in violation of DR 9–103(A). He also failed "promptly" to pay the funds to his client in violation of DR 9–103(B)(4), and he made misrepresentations to his client in violation of DR 1–102(A)(4). The Board recommended, and the Court imposed, suspension for six months.

Turning to the *third* category of prior cases where the sanction was long-term suspension, the two leading precedents are *In re Hines*, 482 A.2d 378 (D.C.1984), and *In re Harrison*, 461 A.2d 1034 (D.C.1983). In *Hines*, the attorney's misconduct consisted of both commingling and misappropriation in violation of DR 9–103(A), *plus* a failure "promptly" to pay funds owing to his client in violation of DR 9–103(B)(4). Moreover, these violations in *Hines* were accompanied by other serious violations, *e.g.*, "dishonesty" and "deliberate misrepresentations" in violation of DR [1–]10[2](A)(4) and intentional prejudice or damage to his client in violation of DR 7–101(A)(3). In addition, the misconduct in *Hines* involved two clients in two separate matters.

The sanction in *Hines* was suspension for two years. It was in *Hines* that the Court announced that "we take this occasion to notify the Bar that in future misappropriation cases disbarment will ordinarily be the sanction imposed by this Court." 482 A.2d at 386. However, the *Hines* opinion stressed that the word "ordinarily" had been intentionally included in this announcement because "there may be instances of misappropriation which, for any number of reasons, may call for a lesser sanction." *Id.*

In *Harrison*, the misconduct consisted of commingling, *plus* unintentional misappropriation in violation of DR 9–103(A), *plus* a failure "promptly" to pay funds owing to his client in violation of DR 9–103(B)(4). The record in *Harrison* also showed aggravating factors. Thus, after commingling his client's funds in his own bank account, the attorney not only misappropriated those funds; he also "intentionally evaded" his client's repeated requests for payment of the funds. *Id.* at 1035. Moreover, when a check was finally given to the client after a delay of two months, this check was returned for insufficient funds. Then, a month later when part of the misappropriated funds were finally paid to the *client*, two more weeks elapsed before the attorney in *Harrison* released the additional misappropriated monies for payment of the client's medical bills.

The fourth category of prior precedents covers the most egregious forms of commingling/misappropriation where the evidence typically shows multiple instances of commingling plus an intentional misappropriation of a client's funds sufficient to establish dishonesty or a pattern of such misconduct. In that type of case, disbarment is clearly the appropriate sanction in this jurisdiction. *In re Burton*, 472 A.2d 831 (D.C.1984); *In re Minninberg*, 485 A.2d 149 (D.C.1984); *In re Burka*, 423 A.2d 181 (D.C.1980); *In re Quimby*, 123 U.S.App.D.C. 273, 359 F.2d 257 (D.C.C. 1966). *See also, In re Hines*, 482 A.2d 378, 386 (1984).

**B. Respondent's Misconduct Does Not Warrant Disbarment As Urged by Bar Counsel**

Bar Counsel argues that Respondent's misconduct falls within the fourth category of prior precedents and that therefore disbarment should be imposed. However, Bar Counsel relies on cases where the attorneys had clearly engaged in deliberate and egregious forms of dishonesty or intentional misappropriation. The misconduct in those cases bears little resemblance to the misconduct here. The pertinent precedents and distinguishing facts are set forth in the margin.[6]

**C. The Misconduct in this Case Requires a Stronger Sanction Than Public Censure As Urged by Respondent**

Respondent's position is that the appropriate sanction, if any, should be no more than public censure, which is at the opposite end of the spectrum from disbarment as urged by Bar Counsel. However, just as the cases cited by Bar Counsel are inapposite, the Board is unanimous in its view that the public censure cases relied upon by Respondent are distinguishable.

Both *Gilchrist* and *Artis, supra,* are illustrative precedents involving commingling where the sanction was public censure. Since the misconduct in *Gilchrist* and *Artis,* as here, extended beyond a simple commingling offense, it is essential to compare the nature and depth of the *other offenses* on a relative scale of ethical considerations.

In this case, Respondent's *other* offense (in addition to simple commingling), consists of inadvertent misappropriation, but nothing more. In both *Gilchrist* and *Artis,* the *other* offense was the failure to maintain complete records of a client's funds as required by DR 9–103(B)(3).

In weighing these "other" offenses, the Board concludes that the balance tilts toward a stronger sanction against Respondent in this case than public censure, which was the sanction in *Gilchrist* and *Artis.* This conclusion rests on the premise that, on a relative scale of unethical misconduct, any type of misappropriation of client's funds is a more reprehensible offense than the failure to maintain complete records of the client's funds. The latter type of offense is analogous to neglect, or inadequate preparation, where mild sanctions are generally imposed for first-time offenders. For example, for an attorney with no prior disciplinary violations, a violation consisting of simple neglect often results in only an informal admonition by Bar Counsel or public reprimand by the Board. *In re Confidential,* Bar Dkt. 150–85 (B.P.R. Rep. April 21, 1987). If the neglect is accompanied by a prior disciplinary record, then public censure by the court might be appropriate. *Compare In re Williams,* M–111–82 (D.C.C.A. May 22, 1987).

Respondent also relies on *In re Branham,* No. 26–75 (D.C.App. Feb. 3, 1978), a case in which the Court imposed public censure as recommended by the Board. However, the misconduct in *Branham* is distinguishable because the attorney there did not misappropriate or use the client's funds to defray the attorney's personal or office expense. Rather, *Branham* was a case where the attorney made an improper

---

**6.** *See In re Quimby,* 123 U.S.App.D.C. 273, 359 F.2d 257 (1966) (involved embezzlement conviction, for which an intent to convert is a necessary element); *In re Burka,* 423 A.2d 181 (D.C. 1980) (*en banc*) (Respondent disbarred for commingling and misappropriating funds, failing to maintain complete records and render appropriate accounts, failing to pay over promptly client funds, dishonest conduct in making unauthorized withdrawals of client funds for his own use, and engaging in conduct prejudicial to the administration of justice in failing to turn over client's assets to court and in failing to submit records to auditor upon request); *In re McClellan,* M–51–80 (D.C.App. Mar. 26, 1981) (*en banc*) (attorney disbarred for failing to disburse

monies to client in three separate cases and failing to appear in scheduled proceedings in other cases); *In re McLean,* M–142–82 (D.C.App. Apr. 11, 1983) (attorney disbarred for commingling and misappropriating client's funds and thereafter making false statements and presenting false evidence to Bar Counsel); *In re Moore,* 83–141 (D.C.C.A. June 10, 1983) (attorney disbarred for deliberately and dishonestly misappropriating client funds and misrepresenting to client the status of the funds); *In re Burton,* 472 A.2d 831 (D.C.1984) (commingling and misappropriation in two separate cases and lying to Auditor–Master in defense of misconduct); *In re Minninberg,* 485 A.2d 149 (D.C.1984) (attorney disbarred for misappropriation in two cases).

or unauthorized investment on behalf of the client.

Respondent's reliance on the public censure precedents is misplaced.

### D. *Short–Term Suspension Is An Appropriate Sanction For Respondent's Misconduct*

Although the Board is unanimous that neither disbarment nor public censure would be an appropriate sanction in this case, the Board is divided on the question whether Respondent's misconduct falls within the comparability range of prior precedents for short-term suspension, or whether the precedents for long-term suspension should be regarded as controlling.

The Board's majority concludes that a comparative analysis of the controlling authorities places Respondent's misconduct in the short-term suspension category. The leading pertinent precedents are *In re Bryant*, 425 A.2d 1313 (D.C.1981); *In re Harrison*, 461 A.2d 1034 (D.C.1983); and *In re Hines*, 482 A.2d 378 (D.C.1984). The court's *en banc* opinion in *In re Reback*, 513 A.2d 226 (D.C.1986) is also significant, along with the Board's Reports in two cases now pending before the court. *In re Buckley*, Bar Dkt. 488–82 (B.P.R. May 12, 1986); *In re Thajauna Miller, Bar Dkt.* 175–81 (B.P.R. Sept. 17, 1987).

Once again, the focus of the Board's analysis is a comparative evaluation on a relative ethical scale of Respondent's *other violations* and the *other violations* in the pertinent precedents. Such an analysis shows, at the very least, that one cannot utter the magic word "commingling" and "inadvertent misappropriation" and then leap to the conclusion that the sanction must be long-term suspension.

In comparison with *O'Bryant*, the analysis requires a balancing of Respondent's *other* violation (consisting of inadvertent misappropriation) against *O'Bryant's other* violations consisting of misrepresentations *and* a failure "promptly" to pay funds belonging to his client. The Board concludes that on a relative scale of unethical conduct, a strong argument could be made that there is only a marginal difference between Respondent's inadvertent misappropriation that never materialized into a bad check or financial loss to his client, on the one hand, and *O'Bryant's* misrepresentation and failure promptly to pay violations, on the other. *Compare In re Reback*, 513 A.2d 226 (D.C.1986) (*en banc*) (six months' suspension for deceitful misrepresentation, forgery, and neglect). Indeed, viewed from an ethical standpoint, a lawyer who makes misrepresentations to his client, as in *O'Bryant*, may require closer scrutiny for resuming the practice of law than one who, through negligence and inadvertence allowed his bank account to drop below the amount owed to his client. On that basis, Respondent's sanction here should be in keeping with suspension for six months, as was imposed in *O'Bryant*.

The Board nonetheless recommends that Respondent herein should be suspended for one year, which is twice the suspension in *O'Bryant* and *Reback*. About three years after the *O'Bryant* opinion, the Court of Appeals announced in *In re Hines*, 482 A.2d 378 (D.C.1984), a new standard whereby disbarment will "ordinarily" be the sanction for intentional misappropriation going beyond "simple negligence", and the Board interprets this announcement as a signal that commingling resulting in inadvertent misappropriation warrants a stronger sanction than *O'Bryant's* commingling plus misrepresentation and failure promptly to pay. This is an important point in the Board's legal analysis that contributes to the recommendation of a one-year suspension for the Respondent in this case.

The dissenting opinion relies on the decision in *Harrison*, where the court imposed a long-term suspension of a year and a day. However, the Board's majority agrees with the Hearing Committee that Respondent's misconduct in this case is less egregious than in *Harrison*, because several distinguishing factors differentiate this case from *Harrison* and put it squarely in the category of prior precedents calling for short-term suspension of less than a year and a day.

In the first place, there is a fundamental difference in terms of the disciplinary *violations*. The attorney's misconduct in *Harrison* was "more than a mere technical violation of the Code" involving commingling and inadvertent misappropriation, because "Harrison evaded Hart's [the client's] request for restitution for several weeks by refusing to take calls or respond to his letter, [and when] ... he finally paid, the [initial] check was returned for insufficient funds," causing further delay. 461 A.2d at 1036. These facts in *Harrison* established a violation of DR 9–103(B) for failure "promptly" to pay funds owed to the client. In contrast, the Respondent in this case did not commit any such violation of the "promptly" requirement of Rule 9–103(B)(4).

Because this distinction is so important, the dissenting opinion of the Board argues strenuously that Respondent's conduct did violate DR 9–103(B)(4) as a matter of law,[7] despite the Hearing Committee's contrary findings and conclusion. However, without a violation of DR 9–103(B)(4), there is no principled basis on which to conclude that Respondent's conduct here is comparable to that found in *Harrison*.

There are other distinguishing factors, all significant, that place Respondent's misconduct in the category calling for short-term suspension. Unlike *Harrison*, the Respondent here actually prepared and mailed to his client, *in timely fashion*, a check for the full amount due to the client.[8] Harrison did not do so.

Here, in late December 1984 Ms. Cox explained her renewed complaint to Mr. Smink (the new attorney), and he then relayed it to Respondent a few days later. The main thrust of the complaint continued to be Ms. Cox's insistence upon receiving $1,862 from Respondent, rather than $912 which was the correct amount due to her. Moreover, Respondent offered to satisfy this part of the client's complaint if she would simultaneously pay the amount of the legal fees she owed to Respondent. The delay in *Harrison* did not occur in the temporizing context of such a fee dispute as here involved.

Moreover, as compared to *Hines* where a long-term suspension was imposed, Respondent's misconduct is clearly less egregious. As the Court noted in *Hines*, the attorney had "acted deceitfully toward two different clients and misappropriated funds from both of them. 482 A.2d at 386. Here, in contrast, Respondent's misconduct involved only one incident related to a single client, and there was no deceit.

In a case, now pending before the Court, *In re Buckley*, Bd.Dkt. 488–82 (B.P.R. May 12, 1986), the Board found that the attorney had commingled and misappropriated his client's funds in violation of DR 9–103(A) and DR 1–102(A)(4), the latter involving dishonesty. In *Buckley*, the attorney expressly acknowledged that during the two year period of confusion over the disposition of the settlement funds of his client, he deposited those funds in an office bank account and used them for payment of personal and office expenses. The Board has recommended that the attorney in *Buckley* should be suspended for two years in keeping with the *Hines* precedent.

Respondent in the instant case did not knowingly use his client's funds or commit any dishonesty violation. His misappropriation was not purposeful, but merely negligent and inadvertent. Long-term suspension is not called for.

E. *Respondent's Misconduct Did Not Show An Ethical Unfitness Sufficient To Require Proof of Fitness Before Resuming the Practice of Law*

It is important to recognize that the dividing line between short-term and long-

---

7. For the reasons noted *supra*, pp. 706–709, the Board disagrees with the dissent's position on the "promptly" issue.

8. The dissenting [majority] opinion of the Board attempts to denigrate this finding of the Hearing Committee on the ground that on August 17, when Respondent mailed the check to Ms. Cox, his bank account dipped below the amount of the check. However, three days later on August 20, the balance in his bank account was restored to an amount substantially more than the check to Ms. Cox and remained at that level for over a month, or more than double the 14 days Ms. Cox took to negotiate the second check sent to her. *See* Petitioner's Exhibits 11 and 12; Hrg.Com.Rep. at 5.

term suspension is designed to identify those attorneys whose misconduct demonstrates a general ethical unfitness which is sufficient to justify the imposition of a sanction that requires proof of such fitness in a separate reinstatement proceeding before the attorney is permitted to resume the practice of law. Where the attorney's misconduct is so far out of step with minimal ethical requirements, it is appropriate to require such an attorney, before resuming the practice of law, to prove by clear and convincing evidence that he can satisfy the five factors of *In re Roundtree*, 503 A.2d 1215 (D.C.1985). Although the dissent recommends only one more day of suspension than is recommended by the Board's majority, the addition of one day would place the sanction in the long-range category requiring a re-instatement proceeding that often adds several months to the stated period of suspension.

So, the core question is: Was the Respondent's misconduct in this case so deplorable and reprehensible that he should be required to prove his fitness before resuming the practice of law? The Hearing Committee concluded "that Respondent's misconduct ... does not demonstrate [such] ... general unfitness." Hrg.Com. Rep. at 18.

The Board agrees. In reaching that conclusion, the Board has considered several mitigating factors, all undisputed:

—Respondent has no record of prior discipline. *In re Reback*, 513 A.2d 226,-233 (D.C.1986) (*en banc*).

—Respondent has cooperated fully throughout these proceedings. *Id.*

—Respondent's client suffered no financial harm. Respondent never issued his client a bad check. Nor did he avoid issuing a second check once he confirmed that the first check has not been cashed. *Compare In re Harrison*, 461 A.2d 1034, 1036 (D.C.1983) (presence of these elements are aggravating items).

—Respondent's misconduct occurred when he was a sole practitioner who had no administrative assistance on financial matters, other than a book-keeper located in New Carrollton. *See In re Lawrence*, 526 A.2d 931, 399 n. 5 (D.C.1987).

—Respondent has taken corrective steps by joining a law firm where he no longer has accounting or financial responsibilities. *Compare, In re O'Neill*, Bar Dkt. 502–82 (B.P.R. Apr. 29, 1985).

—Respondent was subjected to lengthy delays in the disciplinary process through no fault of his own. It took Bar Counsel one and one-half years to institute formal disciplinary proceedings, and an additional eight months had expired when the Hearing Committee issued its report shortly before the Board's summer recess, which also has added to the delay. *In re Williams*, 513 A.2d 793, 798 (D.C.1986).

These factors have all been recognized as having a mitigating effect that justifies a sanction nearer the lesser end of the permissible range for the type of misconduct involved.

In this case, there have been delays through no fault of Respondent. In a case now pending before the court, *In re Thajuana Miller*, Bar Dkt. 175–81 (B.P.R.Rep. Sept. 17, 1987), there were lengthy delays in the disciplinary proceedings, and the Board has recommended a reduced sanction of short-term suspension (less than a year and a day) in large part because of those delays. While the delay in this case has not been as extensive, it is nonetheless a mitigating factor.

Throughout the proceeding herein, the Respondent has cooperated with Bar Counsel. He understands his misconduct, which may have been influenced in part by the fact he was then a sole practitioner. He is now associated with a firm where he is not directly responsible for client funds. This suggests that similar misconduct will not occur in the future, and it led the Hearing Committee to conclude that the problem has already been "remedied".

## CONCLUSION

Because we find Respondent's conduct to be the product of inadvertence and negli-

gence; because we find the facts of his misconduct less serious than the facts of *Harrison* and *Hines,* and more in keeping with those in *O'Bryant;* and because we find Respondent's misconduct in this instance does not demonstrate a general unfitness to practice law, we recommend that Respondent be suspended from the practice of law for a period of one year.

> BOARD ON PROFESSIONAL RESPONSIBILITY
> By: /s/ J. Randolph Wilson
> J. RANDOLPH WILSON, ESQUIRE
> By: /s/ Ann Keep
> MS. ANN KEEP

Date: October 9, 1987

All members of the Board concur in this Report and Recommendation except, Mr. Foster and Ms. Rosenberg, who have filed a dissenting opinion and Mr. Freund, who has filed a separate dissenting opinion.

## BOARD ON PROFESSIONAL RESPONSIBILITY DISTRICT OF COLUMBIA COURT OF APPEALS

Bar Docket No. 45–85

IN THE MATTER OF: STEPHEN O. HESSLER, RESPONDENT.

### *DISSENTING OPINION*

Once again the Board wrestles with the difficult issue of misappropriation. In what I perceive to be the Board's understandable desire to reach a lenient result in this case, the majority does unnecessary violence to the precedents in this area. In short, if the Court adopts the recommendation of the Board in this case, a tendency toward inconsistent sanctions will be fostered in violation of Rule XI, Section 7(3).

I. *THE RECOMMENDATION OF THE HEARING COMMITTEE AS TO VIOLATIONS.*

It is worth pausing for a moment at the outset to consider specifically the charges in this case and their proposed disposition by the Hearing Committee. Respondent was charged with four violations: 1) commingling in violation of DR 9–103(A), which

was found by the Hearing Committee; 2) misappropriation of client funds in violation of DR 9–103(B), which was found by the hearing committee; 3) dishonesty in violation of DR 1–102(A)(4), which was *not* found by the Hearing Committee; and 4) failure to pay over promptly funds due to his client in violation of DR 9–103(B), which was *not* found by the Hearing Committee. The majority of the Board proposes to affirm these four findings by the Hearing Committee. I agree as to three of the four.

The commingling charge and the misappropriation charge are unexceptionable, and the Hearing Committee's disposition of these two charges can hardly be questioned. I also agree that the Hearing Committee correctly found that Bar Counsel had not proved conduct involving dishonesty by clear and convincing evidence. The entire record of Respondent's conduct in this case demonstrates carelessness, recklessness, and even a callous disregard of his responsibilities concerning client funds under the Code of Professional Responsibility. But there is no significant evidence that Respondent was trying to cheat his client, steal her funds, or otherwise act with dishonesty toward her.

However, I feel that the Hearing Committee erred in not finding a violation of Respondent's duty to turn over promptly funds belonging to his client.[1] The Hearing Committee found, with considerable justification, that Respondent was not guilty of delay in turning over his client's funds during the period between August 17, 1984, when he first sent her a check, and the unspecified date in early December when Respondent's client again contacted him in response to his September 25 letter. During that period of time, Respondent believed in good faith that his client: 1) had received his check for part of the recovery representing the net after withholding of his fee; and 2) that her real complaint was that she wanted the entire recovery sent to her so that she could issue a check back to Respondent for his fees. Nevertheless,

---

**1.** The Chair of the Hearing Committee dissented from the Hearing Committee's finding that Re-

spondent had not violated his duty to turn over the client's funds promptly.

once the client began to call Respondent regularly during the month of December, he was on notice that there was a problem in this case. Certainly by December 8, 1984, when Respondent received a letter from his client stating that she had not received her check, as he had theretofore believed, he was on notice that DR 9–103(B) required him to take prompt action.

Instead, for the next twenty days he did not turn over his client's money to her or, for all that we know, take any action to determine the status of her money. On December 28, his client had obtained the services of a new lawyer, who began trying to contact Respondent in order to urge him to resolve the matter promptly.

The new lawyer and Respondent spoke on January 2, 1985, and the new lawyer made it clear to Respondent that he had a very serious problem on his hands and that his former client was likely to complain to Bar Counsel (as indeed she already had) if Respondent did not act promptly. Once again, Respondent took no effective action to: 1) determine whether his client had received her money; and 2) if she had not, to make it good to her promptly as he was required to do under the rules. This situation should have alarmed any reasonably prudent lawyer and should have galvanized Respondent into prompt action. Instead, for the next ten days he once again failed to take any effective action to resolve the matter, thereby forcing his client's new attorney to call him again on January 12, 1985, to urge prompt resolution of the matter.

Respondent's response to the new lawyer's second call was to let another two weeks go by so that when his former client's new lawyer called a third time on January 25, 1985, he still had not resolved the matter. During that telephone conversation, the new lawyer told Respondent that his former client had filed a complaint with Bar Counsel. Suddenly, Respondent leapt into action and during the following weekend reviewed the records and determined that he had never received any cancelled check to this client from his bank. Finally, on February 2, 1985, Respondent reacted by sending a new check to his client.

Thus, the record reveals that Respondent delayed for fifty-six days, or nearly two months, after his client had brought to his attention her claim that she had not received the money to which she was entitled.[2] It is unproductive to try to define exactly what the word "prompt" means in the context of DR 9–103(B). Whatever the word means, it does not mean nearly two months of inactivity. Clients expect more responsiveness from their lawyers when it comes to turning over property belonging to the client, and under the Code of Professional Responsibility, they are entitled to it. All Respondent had to do was move expeditiously to determine whether or not his client had cashed the check. Had he done so, he would have discovered that she had not. Thereafter, a simple stop order at his bank and a new check issued to the client would have satisfied his obligation under the Code to turn over property of the client promptly.

In sum, I feel that the Hearing Committee erred when it rejected Bar Counsel's charge of a violation under DR 9–103(B).

## II. SANCTION.

There is simply no principled way in which this case can be meaningfully distinguished from *In re Harrison*, 461 A.2d 1034 (D.C.1983). *Harrison* was a misappropriation case, like this case. *Harrison* was a case in which the Board and its Hearing Committee had been unable to find a dishonesty violation of DR 1–102(A)(4), like this case. *Harrison* was a case that smacked of inadvertence and sloppiness, unlike the obviously conniving

---

2. Whether the period of delay was fifty-six days (from December 8, 1984, to February 2, 1985) or thirty-one days (from January 2, 1985, when the complainant's new lawyer spoke to him, to February 2, 1985) makes no substantial difference to my analysis of the case; in either event, Respondent did not react with the promptness the disciplinary rules require. Of course, what constitutes sufficient promptness will vary according to the factual context of each case. But on these facts, neither fifty-six nor thirty-one days can be convincingly said to be prompt.

misappropriation in cases like *In the Matter of Quimby,* 123 U.S.App.D.C. 273, 359 F.2d 257 (1966); *In the Matter of Burka,* 423 A.2d 181 (D.C.1980) (*en banc*); *In re McClellan,* No. M–51–80 (D.C. March 26, 1981); *In re McLean,* No. M–142–82 (D.C. April 11, 1983); *In re Moore,* No. 83–141 (D.C. June 10, 1983); *In re Burton,* 472 A.2d 831 (D.C.1984); *In re Minninberg,* 485 A.2d 149 (D.C.1984).

There merges from this line of cases a rule that disbarment is the ordinary sanction in ordinary cases of misappropriation. Indeed, our Court of Appeals has announced exactly that rule *In re Hines,* 482 A.2d 378 (D.C.1984). Out of the *Hines* rule mandating disbarment in ordinary case of misappropriation there has emerged an exception, which is most clearly set forth is to the effect that, whenever misappropriation is a result of sloppiness or inadvertence, as opposed to dishonesty, the Board will recommend, and the Court will impose, a sanction of a suspension of a year and a day rather than the ordinary sanction of disbarment. The Board has, in its majority and minority opinions, debated this distinction at considerable length in *In re Buckley,* Bar Docket No. 488–82 (BPR May 12, 1986), now pending before the District of Columbia Court of Appeals.

If one analyzes this case on the dichotomy postulated in *Harrison* and *Buckley,* there is no doubt that it falls on the inadvertent side of that distinction. That being the case, a suspension of a year and a day is the appropriate sanction in light of the *Harrison* case discussed above.

I find the majority's attempt to distinguish *Harrison* to be unconvincing. There is always a tendency to exalt the individual facts of each case to the exclusion of general principles. But Rule XI, Section (7)(3) gives us the guidelines by reference to which we must operate. Those guidelines mandate that similar conduct should be the subject of similar sanctions. *In re Reback and Parsons,* 513 A.2d 226, 230 (D.C.1986) (*en banc*). Since the conduct in this case cannot, in my view, be rationally distinguished from the conduct described in *Har-*

*rison,* the same sanction must follow. Harrison delayed in returning the funds to the client. Indeed, he even issued a false check to his client. However, Harrison's total delay amounted to no more than seventeen days (December 3, 1979, when the first check that was ultimately dishonored, was issued to December 20, 1979, when the client went to Harrison's office and picked up a check that was honored by Harrison's bank). That delay of seventeen days is less serious than the delay of fifty-six in this case and balances out the additional opprobrium that attaches to Harrison's issuance of a check that was ultimately dishonored. Otherwise, the facts of the two cases are not distinguishable.

For the reasons stated above, I believe that a suspension of a year and a day is the appropriate sanction in this case.

> BOARD ON PROFESSIONAL RESPONSIBILITY
> By: /s/ Mark W. Foster
> MARK W. FOSTER,
> Chair

Date: October 9, 1987

Ms. Rosenberg joins in this opinion.

### DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBILITY

Board Docket Number 45–85

IN THE MATTER OF: STEVEN O. HESSLER, RESPONDENT.

*Separate Dissenting Opinion*

I concur in the result urged by the dissenting opinion because I believe that opinion correctly recites both the current state of the Court of Appeals' decisions on sanctions in misappropriation cases [1] and the consistency standard of Rule XI. Taken together, those two factors justify a suspension in this case exceeding one year.

I write separately, however, because I believe that there is a serious disparity in sanctions between cases involving gross dishonesty and cases, such as this one, involving technical, inadvertent misappropriation. In cases involving serious acts of

---

1. In that regard, I would reach the same result even in the absence of a DR 9–103(B) violation.

dishonesty (*In re Reback*, 513 A.2d 226 (D.C.1986) (*en banc*); *In re Hutchinson*, 521 A.2d 676 (D.C.1986) (*reh. en banc granted*); and *In re Austern*, 524 A.2d 680 (D.C.1987))—all of which involved serious and intentional acts of dishonesty by attorneys—the Court imposed suspensions of six months or less. Following the Court's teaching, the Board recommended the sanction of a ninety-day suspension *In re Sandground*, Bd. No. 335–84 (B.P.R. Dec. 5, 1986), and a one year suspension in *In re Miller*, Bd. No. 175–81 (B.P.R. September 17, 1987). In each of these cases, disciplined attorneys acted dishonestly, knowing—and in some cases intending—that their dishonest conduct would deceive others to their prejudice.

In this case, Hessler had no such knowledge or intention. He commingled client funds, that is a certainty. But in August he sent his client a check for all that was owed and, had she received and cashed it, she would have had her money. Were those the facts, this case would have been a simple commingling case which would likely never have reached the disciplinary system.

Of course, those are not the facts and the subsequent history shows why the disciplinary system cannot condone commingling that ripens into even inadvertent misappropriation. There was a substantial period of time when the client funds were in jeopardy. But acknowledging that the disciplinary system cannot condone inadvertent misappropriation is a far cry from saying that it is more serious than dishonest conduct done with the intent to deceive or injure.

I have come to the conclusion that some dishonesty cases are more serious than some misappropriation cases. I believe that the facts in *Hutchinson, Reback, Sandground* and *Austern* all demonstrated substantially more serious misconduct than do the facts in this case. And I believe that Rule XI's admonition of consistency requires more than simply insuring consistency within categories of cases. In my judgment, it is time to reexamine the ranges of sanctions in dishonesty and mis-appropriation cases, imposing the most severe sanctions in those cases of both kinds where the conduct is intentional, is designed to deceive and prejudice, and does cause prejudice, and imposing less severe sanctions in those cases of both kinds where the conduct is unintentional, is not designed to deceive or prejudice and does not in fact cause prejudice. What the extremes in those ranges should be I am not presently prepared to say. However, until such a reexamination, I believe that the case law requires a lengthy suspension in any misappropriation case, including those—like this one—which involve inadvertent misappropriation.

/s/ Jeffrey Fruend
JEFFREY FREUND

Date: October 9, 1987